**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.                                      No. 00-4566

STANLEY BALDWIN,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(CR-99-52-F)

Argued: April 6, 2001

Decided: July 18, 2001

Before LUTTIG and GREGORY, Circuit Judges, and
Rebecca Beach SMITH, United States District Judge
for the Eastern District of Virginia,
sitting by designation.

Affirmed by unpublished opinion. Judge Smith wrote the opinion, in
which Judge Luttig and Judge Gregory joined.

## COUNSEL

**ARGUED:** Stephen Clayton Gordon, Assistant Federal Public
Defender, Raleigh, North Carolina, for Appellant. J. Gaston B. Wil-
liams, Assistant United States Attorney, Raleigh, North Carolina, for
Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public

Defender, Raleigh, North Carolina, for Appellant. Janice McKenzie Cole, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

SMITH, District Judge:

Stanley Baldwin ("the Defendant") appeals the sentence he received following his guilty plea to bank fraud. *See* 18 U.S.C.A. § 1344 (West 2000). He contends that the district court erred in departing upward from the applicable guideline range, based on the finding that the Defendant's fraud resulted in damage to the credit reputations of his fraud victims. *See U.S. Sentencing Guidelines Manual* § 2F1.1 (1998). Because we conclude that the district court acted within its discretion, we affirm.

I.

The Defendant was charged with bank fraud stemming out of a scheme that ran from March, 1996, until January, 1998. The fraudulent scheme began when the Defendant received, by mail, a pre-approved credit application in the name of Stanley Britt Baldwin ("Britt Baldwin"), who is unrelated to the Defendant. The Defendant took the credit application to a branch of the United Carolina Bank ("UCB"),[1] and a bank employee inadvertently gave him Britt Baldwin's social security number. Thereafter, the Defendant used Britt Baldwin's social security number to obtain credit and financing and to access Britt Baldwin's bank accounts.[2] The Defendant also used the

---

[1] UCB has since become Branch Banking & Trust Company.

[2] The Defendant used Britt Baldwin's social security number to finance the purchase of a guitar in the amount of $1,568.08; to obtain a car loan

social security number of his eleven-year-old son, Stanley Baldwin, Jr. ("young Baldwin"), to obtain financing.[3]

Sometime in 1996, Britt Baldwin noticed that two checks, which he did not write, had been cashed on his account at UCB. When he challenged the checks, the bank credited his account, and he gave the matter no more thought. Britt Baldwin became concerned when the outstanding balance on his credit report went above $124,000.00. In a sworn affidavit, Britt Baldwin denied responsibility for twenty-four credit entries on his credit reports. Britt Baldwin secured the services of an attorney to restore his damaged credit. However, Britt Baldwin later told investigators that he incurred no direct monetary loss as a result of the Defendant's activities, except travel to and from his attorney's office. Moreover, the attorney did not charge Britt Baldwin a fee for the services rendered to restore Britt Baldwin's credit.

On July 20, 1999, a grand jury indicted the Defendant on seven

---

in the amount of $20,030.71; and to obtain personal loans in the amounts of $3,800.00 and $3,499.93. The vehicle was repossessed after the Defendant failed to make any payments. The Defendant made only one payment of $80.00 on one of the personal loans, and both personal loans were written off by the lending institutions as bad debt.

The Defendant, jointly with his girlfriend, purchased a mobile home by making a cash down payment and using Britt Baldwin's social security number to finance the remaining balance of $78,750.00. The Defendant made payments only sporadically, and admitted to using fraudulently obtained funds to make at least one payment. The mobile home was repossessed and sold at a loss. The Defendant purchased a truck by using a check written on a closed account, in the amount of $3,485.00, as a down payment and financing the remainder by using Britt Baldwin's social security number. The truck was subsequently repossessed for failure to make payments.

The Defendant obtained counter checks in the amounts of $450.00 and $200.00, written on Britt Baldwin's checking account. He also obtained a counter check for $3,700.00, by representing himself as Britt Baldwin.

[3]The Defendant used his son's social security number to obtain a car loan in the amount of $22,274.50, and a personal loan in the amount of $1,754.00. The vehicle was repossessed, due to the Defendant's failure to make payments, and sold at a loss.

counts of bank fraud. On April 17, 2000, the Defendant pled guilty, pursuant to a written plea agreement, to one count of bank fraud, in violation of 18 U.S.C. § 1344.

Although the presentence investigation report (the "PSR")[4] indicated no grounds for departure, the district court gave notice prior to sentencing that it was considering an upward departure "based on harm caused to the victims whose identities the Defendant misappropriated." J.A. 42. At the sentencing hearing, the court called Joseph Casper, an agent with the United States Secret Service, to testify about the offense conduct. The court engaged in the following colloquy with Casper:

> THE COURT: What was the effect upon this Stanley Britt Baldwin? Did he suffer credit—
>
> THE WITNESS: Mr. Stanley Britt Baldwin suffered a lot of trouble. As a matter of fact, when we finally got in touch with Mr. Britt Baldwin he had already obtained the services of an attorney to assist him in trying to get him out of the quagmire of the credit problem that he was in.
>
> THE COURT: It impaired his credit reputation, would that be fair to say?
>
> THE WITNESS: Yes, Your Honor, to say the least.
>
> THE COURT: And his reputation for integrity, I would presume, as well?
>
> THE WITNESS: His reputation in the community. He was having difficulty cashing checks and other things like that.

---

[4]The PSR provided for a base offense level of six; an increase of seven levels based on the specific offense characteristic of loss exceeding $120,000 but less than $200,000; an additional increase of two levels for more than minimal planning; and a decrease of two levels for acceptance of responsibility, for a total offense level of thirteen. *See* U.S.S.G. §§ 2F1.1(a), (b)(1)(H), (b)(2)(A), 3E1.1(a). The PSR placed the Defendant in Criminal History Category III.

THE COURT: What was the effect—what was it about the son? He took his son's social security as well?

THE WITNESS: Your Honor, he also obtained a—purchased a motor vehicle in his—I believe his 10 or 11 year old son's social security number—Mr. Baldwin's social security number. This Mr. Baldwin's son's social security number.

. . . .

THE COURT: And, of course, the effect on his son's credit won't be determined for a number of years, I would assume.

THE WITNESS: That's correct, Your Honor.

*Id.* at 46-47.

After reducing the total offense level by one in response to a defense objection to the PSR,[5] the court stated that it would depart upward by two levels. The court explained:

Because [the Defendant] didn't just defraud these institutions. He defrauded the identity or assumed the identity of other persons to their detriment and I think that's more heinous than the financial loss. There's an old adage, he who steals my wallet steals trash. He who steals my good name steals all. It's the worst crime of all. You can get back the money, but you can't get back your reputation.

*Id.* at 51. The court found that the Defendant's case was atypical, thereby warranting departure, because the guidelines did not account for damage done to the reputations of individuals. *See id.* at 51-52, 54.

The court concluded:

United States Sentencing Guidelines Section 2F1.1 takes

---

[5]The district court found that the loss was less than $120,000, and reduced the total offense level from thirteen to twelve. With a Criminal History Category of III, the resulting guideline range was 15 to 21 months.

> into account the loss to financial institutions. However, it does not take into consideration the endangerment of the solvency or reputation of the victim Stanley Britt Baldwin.
>
> Likewise, it is conceivable that the Defendant's son, age 12, may not feel the impact of his damaged credit for years to come.
>
> And, consequently, the court finds that an upward departure is appropriate based upon the provisions of 2F1.1 application note 11(f) and 5K2.0.

*Id.* at 56. Finding that "in cases in which the loss determined under 2F1.1(b)(1) does not fully capture the harmfulness or seriousness of the conduct an upward departure may be warranted," the court departed upward by two levels, one for each victim. *Id.* at 55-56. The resulting total offense level of fourteen, together with Criminal History Category III, resulted in a guideline range of 21 to 27 months. Accordingly, the Defendant was sentenced to 27 months imprisonment, to be followed by a five-year term of supervised release. The court also ordered the Defendant to pay restitution in the amount of $53,723.33. The Defendant now appeals, challenging his sentence on the ground that the district court's upward departure was unwarranted.

## II.

We review an upward departure under a "'unitary abuse-of-discretion'" standard. *United States v. Barber*, 119 F.3d 276, 282 (4th Cir. 1997) (en banc) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). Under this standard, we afford substantial deference to the district court's departure decision. *See Koon*, 518 U.S. at 98.

Congress has mandated that a district court impose a sentence within the range that results from the proper application of the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C.A. § 3553(b) (West 2000). In order to ascertain

whether a potential factor is an appropriate basis for departure, a sentencing court must first determine whether that factor was forbidden, encouraged, discouraged, or unmentioned as a basis for departure by the U.S. Sentencing Commission. *See Koon*, 518 U.S. at 92-96; *Barber*, 119 F.3d at 279-82. The court determines the category into which a given factor falls by reference to the guidelines, policy statements, and commentary. *See Koon*, 518 U.S. at 92-93. How the district court should proceed is determined by the category into which the factor under consideration falls. *See id.* at 93-96; *Barber*, 119 F.3d at 280-82.

Departure on the basis of a forbidden factor is never permissible. *See Barber*, 119 F.3d at 280. If the court determines that a factor is encouraged but has not been taken into account by the applicable guideline, the court may exercise its discretion and depart from the guideline range. *See id.* at 280-81. On the other hand, if the court determines that an encouraged factor has been taken into account within the applicable guideline, the court may depart "only if it concludes that the factor is present to such an exceptional or extraordinary degree that it is outside the heartland of situations encompassed within the applicable guideline." *Id.* at 281. Similarly, if a factor is discouraged, a district court may depart "only if it finds that the factor exists to such an uncommon degree that it is outside the heartland of circumstances embraced by the relevant guideline." *Id.* Departure on the basis of an unmentioned factor "is permissible only when [the presence of the unmentioned factor] takes the case outside the heartland of situations addressed by the applicable guideline." *Id.*; *see Koon*, 518 U.S. at 96 ("If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland." (internal quotation marks and citation omitted)).

Here, the district court departed upward on the basis of damage to the credit ratings of the Defendant's victims.[6] Although the district

---

[6]In defending the departure, the United States assumes that the district court departed on the basis of "the knowing endangerment of the solvency of one or more victims." U.S.S.G. § 2F1.1, comment. (n.11(f)). Although the court cited this application note, the specific articulated basis for the court's departure was the endangerment to the victims' reputations or credit ratings. *See supra* § I (quoting from sentencing hearing).

court cited application note 11, this note does not expressly identify damage to a victim's credit rating as a potential basis for departure. *See* U.S.S.G. § 2F1.1, comment. (n.11) (providing that in a case where the monetary loss "does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted," and providing examples).[7] Damage to credit rating was not listed by the Commission as a factor that can never be a basis for departure, nor has this factor's appropriateness as a basis for departure been expressly addressed in the guidelines, policy statements, or commentary. Damage to a victim's credit reputation is, therefore, an unmentioned factor.[8] *See United States v. Fenner*, 147 F.3d 360, 364 (4th Cir. 1998).

Because the factor is unmentioned, the departure was proper only if it was not one that the Commission considered to lie within the fraud guideline's heartland. The Defendant cites two unpublished decisions in support of his position that damage to a victim's credit reputation does not take a fraud case out of the heartland.[9]   *See United States v. All*, No. 98-4205, 1998 U.S. App. LEXIS 22676 (4th Cir. Sept. 16, 1998) (per curiam); *United States v. O'Dette*, No. 93-1324, 1994 U.S. App. LEXIS 16184 (6th Cir. June 12, 1994) (per curiam). The *All* case did not involve damage to a victim's credit rating. *See* 1998 U.S. App. LEXIS 22676, at *4-*5. To the extent that

---

[7]*See supra* note 6.

[8]Section 2F1.1 was amended effective November 1, 2000, to provide for a two-level increase in offense level if a defendant obtains a bank loan using another individual's social security number that was obtained without authorization. *See* U.S.S.G. § 2F1.1(b)(5)(C)(i) (2000); *id.* § 2F1.1, comment. (n.16(A)). The amended guidelines suggest that an upward departure might be appropriate if "the offense level does not adequately address the seriousness of the offense," which may be the case, for example, if the offense "caused substantial harm to the victim's reputation or credit record, or the victim suffered a substantial inconvenience related to repairing the victim's reputation or a damaged credit record." U.S.S.G. § 2F1.1, comment. (n.16).

[9]We reject the Defendant's suggestion that the factor does not remove this case from the heartland of fraud cases because "the crime of fraud—like virtually all criminal conduct—inherently victimizes someone else." Brief for Appellant at 13.

*United States v. O'Dette* has precedential value, it supports upholding the departure. In *O'Dette*, the Sixth Circuit observed that the fraud guideline was directed at punishment for losses suffered by the bank, not losses suffered by third parties; in particular, the court found that the fraud guideline is not directed toward the adverse impact fraud may have on a third party's credit. *See* 1994 U.S. App. LEXIS 16184, at *9. We do not find that the district court here abused its discretion in determining that the Commission did not consider the adverse impact that a defendant's fraud may have on the credit reputations of third parties under the guidelines in effect at the time of the Defendant's sentencing.[10]

The Defendant also argues that the district court clearly erred in its determination that there was damage to the victims' credit reputations. The court relied on the PSR and the testimony of Agent Casper. This evidence demonstrates that Britt Baldwin suffered at least a temporary loss to his credit reputation and inconvenience to the point of obtaining an attorney to have his credit reputation restored. Young Baldwin experienced damage to his credit reputation, the effect of which is currently indeterminate. The district court did not clearly err in determining that the Defendant's fraud damaged the credit reputations of his victims. Accordingly, we conclude that the court did not abuse its discretion in basing an upward departure on this factor.

### III.

In sum, we conclude that the district court did not abuse its discretion in determining that damage to credit reputation is a factor that takes a case outside the heartland of the fraud guideline, or in finding that the Defendant's fraudulent activity damaged the credit reputations of Britt Baldwin and young Baldwin. Accordingly, we affirm the decision of the district court.

*AFFIRMED*

---

[10]The subsequent amendment of § 2F1.1 supports this conclusion. *See supra* note 8.