PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                        No. 05-5249

BYRON KEITH ALLEN,
            *Defendant-Appellant.*


UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                        No. 06-4012

ERNEST ROBERT REINHARDT,
            *Defendant-Appellant.*


Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Benson Everett Legg, Chief District Judge.
(CR-02-307)

Argued: March 16, 2007

Decided: June 22, 2007

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

---

Dismissed in part; affirmed in part by published opinion. Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Michael concurred.

---

**COUNSEL**

**ARGUED:** Steven Gene Berry, Rockville, Maryland; Joseph Francis Lawless, Jr., Newtown Square, Pennsylvania, for Appellants. Christine Manuelian, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

GREGORY, Circuit Judge:

Byron Allen and Ernest Reinhardt ("Appellants") appeal, on various grounds, their convictions for wire fraud under 18 U.S.C. § 1343 (2000). Additionally, Reinhardt raises numerous issues concerning his seventy-month sentence. Because the district court did not commit reversible error, we affirm the Appellants' convictions and sentences.

I.

Allen and Reinhardt were indicted on multiple counts of wire fraud in violation of 18 U.S.C. § 1343 arising from their involvement in a scheme that arranged equipment financing for nonexistent equipment. In short, Reinhardt's company, Tech Com, acting as a purported equipment vendor, would arrange, through financing companies, equipment-lease financing for various customers. Reinhardt would take a portion of the loan as a fee and the lessee would keep the remainder. Neither Reinhardt nor his company would provide the lessees with computer equipment. The Government, through prior indictments, secured guilty pleas from eleven other individuals involved in the scheme. A twelfth individual was indicted along with the Appellants but pleaded guilty shortly after trial commenced.

A.

At trial, the Government presented evidence that Reinhardt was the major architect of the fraud scheme, while Allen assisted in the

scheme through preparing and faxing fraudulent documents. Six other participants in the scheme testified; all six gave similar testimony about the logistics of the scheme, Reinhardt's leadership role, and Allen's involvement.

Linda Durkin testified that she was told that Reinhardt could arrange loans through Tech Com, at a cost of twenty percent, to provide needed capital for her mortgage business. Prior to the transaction, Reinhardt told Durkin that the loan was actually an equipment lease for new computers, but that she could use her existing computers as collateral and did not have to provide any documentation as to their value. Throughout her relationship with Reinhardt, Durkin never received any computer equipment—new or used—from Reinhardt or Tech Com. Durkin expressed her concerns about the arrangement and Reinhardt assured her that it was legal, but that the leasing companies "don't really like it." J.A. 5267.

Reinhardt instructed her to tell the financing company that she received new equipment when the company called for verbal verification. Durkin testified that Reinhardt told her: "That if they [the financing company] ask if there's new equipment, yes, it's new equipment. Tell them—you know, tell them it's been installed. If they ask if it's been installed, delivered, you say yes." J.A. 5272. Reinhardt told Durkin when the financing company was going to conduct an on-site inspection. Prior to the inspection, Reinhardt shipped Durkin labels with serial numbers printed on them that she affixed to her existing computer equipment. The serial numbers did not match those on the actual equipment; instead they matched the numbers on the form for the particular lease.

Durkin's account accorded with that of the other witnesses. Clint Garrison and Paul Gregg testified that Reinhardt offered to arrange loans for their financial consulting company for a twenty percent fee. Gregg and Garrison entered into five lease transactions with Reinhardt. Neither Reinhardt nor Tech Com provided any of the computer equipment referenced in the lease documents. Rather, Reinhardt told Garrison to purchase a label gun to manufacture labels with false serial numbers on them and affix those labels to computer equipment prior to a physical inspection. In addition to transactions for their own company, Garrison and Gregg also arranged leases through Reinhardt

for two other companies with which they were involved. None of these companies received computer equipment through the leases from Reinhardt or any of his associates or associated entities. Reinhardt was the contact person on all of these leases.

Likewise, Tigran Khrlobian was introduced to Reinhardt because he needed to raise capital for his insurance agency, Proshield, which had recently emerged from bankruptcy. When he first met with Reinhardt, Reinhardt explained that Khrlobian's company could enter into computer leases and receive money, rather than equipment. Khrlobian entered into at least seven lease transactions through Reinhardt, with Tech Com acting as the purported equipment vendor. He never permanently received any of the computer equipment represented in the leases. When the financing company performed an on-site inspection, Reinhardt brought Khrlobian equipment, used a label maker to affix serial numbers to the devices, and then removed the equipment shortly after the inspection. Reinhardt coached Khrlobian to respond to telephone inquiries from the financing companies by saying that the equipment was there and that Khrlobian was happy with it.

Jacques Smith testified that he started a debt collection business, CRU & Associates, with coconspirator Marc Washington. Smith and Washington were introduced to Reinhardt, who promised that he could arrange for two $50,000 loans to CRU. Smith and Washington had bad credit, but filled out a loan application sent by Reinhardt using Washington's grandmother as the applicant (with her permission).

Reinhardt then informed Smith that the loan would not be approved without CRU having a Dun & Bradstreet ("D&B") report. Smith filled out a basic D&B report for CRU, but the bank was not satisfied and wanted a full D&B report. Smith then filled out a full D&B report, in which he provided a false reference supplied by Reinhardt. Reinhardt told Smith that the bank wanted audited financial statements for the company but that he had contacts in California who could provide financial reports for CRU for $600 to $1,000. Smith and Washington ordered the reports, which arrived two or three days later. Smith and Washington had never provided Reinhardt with any financial information about CRU; the reports they purchased were completely fabricated.

When Reinhardt forwarded Smith the final loan documents that needed to be signed by Washington's grandmother, Smith realized that the loan was actually in the form of a lease for computers. Neither Smith, Washington, nor CRU ever requested or received computer equipment in connection with the loan. Reinhardt told Smith that when the financing company called to ask about the equipment, that Smith should tell them that CRU had received new computer equipment. This first lease transaction yielded CRU around $30,000. The second loan that Smith arranged through Reinhardt required an on-site inspection. Reinhardt faxed Smith a list of serial numbers to affix to the back of CRU's existing computer equipment.

Reinhardt instructed Smith that CRU needed to make at least the first two to four monthly payments on the lease transactions to avoid suspicion of fraud. Reinhardt told Washington that if he made a minimum of six or seven payments on the loan, it would not be red-flagged. After those payments, Reinhardt informed Washington that he could "utilize the insurance that also comes with the leases, and report, act like you had a break-in at your establishment and report the computers stolen to get out of the lease." J.A. 2965.

After a dispute, Smith ended his relationship with Reinhardt and Washington. Washington testified that he then formed his own corporation, Futureview Graphics, which he and Reinhardt used as a lessee in two fraudulent leases. Washington also generated numerous lessees through his friends, using their existing businesses or assisting them in creating new ones. Reinhardt represented Tech Com as the vendor on all of these transactions. Reinhardt took fees of ten to twenty percent on these leases, then Washington took fees and provided the remainder to the lessees. Washington often set up computers at business locations for on-site inspections by finance companies. Reinhardt faxed Washington a list of serial numbers, so that Washington could affix those numbers to the computers. Washington removed the computers after the inspections were complete.

The father of Washington's girlfriend was listed as a guarantor for some of the lease transactions for lessee Variety Cutz and was falsely listed as the president of the company. Washington testified that he joked to Reinhardt about the ownership of Variety Cutz and that Reinhardt compared it to Washington's grandmother nominally own-

ing CRU, because Washington had used her credit. Reinhardt's knowledge of the Variety Cutz arrangement was demonstrated by his threats to Washington's girlfriend that he would "let it be known that [she and Washington] used her father's information." J.A. 3058.

A representative of CIT, which financed seven of Tech Com's leases, testified that the invoice provided by the vendor is the title to the equipment and represents the bill of sale. CIT would not have approved loans if they knew that the equipment in the invoice had never been sold or delivered. If the money from the loan flowed to the lessee rather than the vendor, it would have raised a red flag as a violation of the agreements, which purported to be equipment-financing leases. The seven leases with Tech Com were not sale-leaseback arrangements and were supposed to be for purchase of new equipment. If Tech Com had wanted to finance sale-leasebacks from CIT, there would have been different paperwork evidencing owner-ship and title to the underlying equipment as well as its value. If Tech Com wanted working capital loans, there would have been proof-of-ownership and UCC documents.

Representatives of other financing companies testified to the same material facts. For example, a representative of Alliance Capital testi-fied that he dealt with Reinhardt and Allen at Tech Com and that he understood Reinhardt to be the manager and Allen to be in sales. Alli-ance would not have engaged in any of the lease transactions with Tech Com if they were aware that there was no actual computer equipment.

With respect to Allen, Washington testified that Allen was a sales processor at Tech Com. When Washington submitted a lease-transaction application to Tech Com, Allen was one of the processors who called the customers and verified information before submitting the application to the financing company. Allen assisted with some twenty of the lease transactions that Washington and Reinhardt con-ducted following the creation of Futureview Graphics. Reinhardt told Washington that Allen received commission payments on the transac-tions with which he assisted. Allen received approximately $19,930 in payments from Tech Com. Allen worked from Reinhardt's office at Tech Com, where a fax machine was located. Numerous fax cover sheets were entered into evidence that had Allen's name on them and

referenced lease agreements between Tech Com and various companies. These cover sheets all accompanied invoices or other documents related to the fraudulent lease transactions.

The jury found Reinhardt guilty of twenty-nine counts of wire fraud and Allen guilty of six counts of wire fraud. The jury could not reach a verdict on one count of wire fraud for both defendants and on one count with which only Allen was charged. After a three-day sentencing hearing, the district court sentenced Reinhardt to seventy months in prison and Allen to thirty-seven months. This appeal followed.

## II.

Reinhardt and Allen allege that there was insufficient evidence to sustain their convictions and that the district court improperly instructed the jury on the mens rea requirement of wire fraud. They argue that the evidence did not establish that either engaged in wire fraud because Washington was the architect of the scheme and they were unknowing participants. In addition, they claim that the evidence did not establish that either possessed the requisite mens rea to commit fraud because they believed that the leases would be paid back to the financing companies. Finally, they assert that an error in a jury instruction misstated the law and allowed the jury to convict with less than the required quantum of evidence of fraudulent intent.

In evaluating a challenge to the sufficiency of evidence for conviction, "this Court must determine whether, construing the evidence in the light most favorable to the government, any reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). In our inquiry, the Government is given "the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Accordingly, "if the record reflects that the Government presented substantial evidence from which a reasonable jury could convict, we must uphold the verdict." *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001). Moreover, "[w]here there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evi-

dence and judge the credibility of the witnesses." *Curry*, 461 F.3d at 457 (alteration in original) (quoting *Tresvant*, 677 F.2d at 1021).

A.

When viewed in the light most favorable to the Government, there is ample evidence to sustain the convictions of both Reinhardt and Allen. Wire fraud under 18 U.S.C. § 1343 has "two essential elements: (1) the existence of a scheme to defraud and (2) the use of . . . wire communication in furtherance of that scheme." *Curry*, 461 F.3d at 457. The evidence adduced at trial supports the jury verdict that Allen and Reinhardt engaged in conduct satisfying both elements of the charged offense and that both had the requisite mental state, including intent to defraud, required under the statute. Thus, we reject Appellants' sufficiency of the evidence claim and sustain the jury verdict.

Allen and Reinhardt argue that they were not the principals in the fraud scheme and that Washington was the scheme's mastermind. The evidence presented at trial demonstrates that both Appellants engaged in conduct that satisfies the wire fraud statute. Furthermore, Reinhardt's attempt to portray himself as a victim of Washington does not comport with the weight of the evidence. Five witnesses testified that it was Reinhardt, not Washington, who was the principal architect of the fraudulent scheme. Durkin, Gregg, Garrison, Khrlobian, and Smith all testified that they dealt with Reinhardt in securing financing from lease transactions, that they never received any computer equipment in connection with those transactions, and that Reinhardt told them to make the first few payments on the leases to avoid raising the suspicion of the financing companies. In addition, Reinhardt instructed each of them to represent to the financing companies that they had received new equipment, sometimes going so far as to bring that equipment to their businesses for on-site inspections and removing the equipment after completion of the inspection. The financing companies testified as to their extensive dealings with Reinhardt, whom they believed was in charge at Tech Com and his other companies, and that they never would have provided financing for any lease transactions involving Reinhardt if they were aware that no new computer equipment was being provided to the lessees.

The evidence also demonstrates that Allen participated in the lease transactions, working out of Reinhardt's office, faxing documents, and processing leases by phone. Allen's name appears on the fax cover sheet of numerous faxes containing false invoices in connection with lease transactions. Allen received commission payments from these transactions and was aware that Tech Com was not providing equipment in connection with the leases. Indeed, Allen accompanied Reinhardt on trips to temporarily set up computer equipment with false serial numbers for on-site inspections. Given this evidence, the jury was not unreasonable in concluding that Allen was a full participant in the fraudulent scheme when he interacted with Reinhardt, customers, and financing companies in connection with transactions concerning equipment he knew not to exist.

In sum, overwhelming evidence was adduced at trial to support the convictions of both Reinhardt and Allen on wire fraud and aiding and abetting wire fraud. Contrary to Reinhardt's contention on appeal, he was not Washington's innocent victim, but a full participant in the fraud scheme, instructing other coconspirators on the methodology of the fraud and serving as a chief contact to financing companies. Contrary to Allen's contentions, there is ample evidence that he faxed fraudulent documents and assisted in completing lease transactions for computers that he knew did not exist. Allen cannot feign ignorance of the scheme simply because he did not participate to the extent of Washington or Reinhardt.

## B.

"The intent to repay eventually is irrelevant to the question of guilt for fraud." *Curry*, 461 F.3d at 458; *see United States v. Kenrick*, 221 F.3d 19, 29 (1st Cir. 2000) (en banc) ("[T]he intent element of bank fraud . . . is an intent to deceive the bank in order to obtain from it money or other property. 'Intent to harm' is not required." (footnote omitted)); *United States v. Hollis*, 971 F.2d 1441, 1452 (10th Cir. 1992) ("[I]f a defendant knowingly provided materially false information in order to induce the loan, [bank fraud] is complete, and it is irrelevant whether or not he intended to repay it or was capable of repaying it."); *see also United States v. Bivins*, 104 Fed. App'x 892, 902-03 (4th Cir. 2004) (affirming trial court's refusal to instruct jury based on defendant's theory that he "never intended to cause financial

harm or loss to any financial institution because he believed [a cocon-spirator] would pay back all of the secured loans").

Accordingly, Appellants cannot rely on a belief that the customers for whom they arranged false computer equipment leases from financing companies were going to pay the loans in full. This argu-ment is especially dubious given the evidence that Reinhardt instructed customers on the number of payments to make to avoid being red-flagged, provided false serial numbers to be affixed to equipment to deceive financing company inspectors, and told custom-ers to inform the financing companies that the equipment was new and satisfactory, when, in fact, it did not exist. These actions are suffi-cient to establish the necessary mens rea for wire fraud. *Cf. United States v. Godwin*, 272 F.3d 659, 669-70 (4th Cir. 2001) ("The jury was also entitled to conclude that the partial reimbursements to the initial investors were meant to dispel investor concerns, to quiet what are commonly referred to as 'squeaky wheels,' to keep investigators away from the scheme, and, in sum, to permit the fraud scheme to be perpetrated."); *United States v. Painter*, 314 F.2d 939, 943 (4th Cir. 1963) (noting that lulling payments do not establish good faith as they are intended to conceal the fraud and "ensnare" other victims).

## C.

"The decision to give or not to give a jury instruction is reviewed for an abuse of discretion." *United States v. Moye*, 454 F.3d 390, 397-98 (4th Cir. 2006). Whether the district court has properly instructed a jury on the statutory elements of an offense is a legal question that we review de novo. *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). "However, in reviewing the propriety of jury instructions, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* We will not vacate a conviction on the basis of an erroneous jury charge if, in light of the above inquiry, the charge contained an adequate statement of the law and was not misleading. *United States v. Scott*, 424 F.3d 431, 434 (4th Cir. 2005).

Reinhardt and Allen complain that the district court omitted a clause from a written jury instruction ("Instruction 40") provided to

the jury after they commenced deliberations, and thus that the instruction was erroneous. The district court instructed the jury orally:

> You are instructed that if the defendant participated in the scheme to defraud, then a belief by the defendant, if such belief existed, that ultimately everything will work out so that no one would lose any money does not require a finding by you that the defendant acted in good faith.
>
> If the defendant participated in the scheme *for the purpose of causing some financial or property loss to another*, then no amount of honest belief on the part of the defendant that the scheme would not cause a loss, or would excuse fraudulent actions or false representations by him.
>
> A defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense to the crimes charged in the indictment.

J.A. 4751-52 (emphasis added). When the district court gave the above instruction to the jury in written form as Instruction 40, the middle paragraph was omitted. Reinhardt and Allen contend that the omission of the phrase "for the purpose of causing some financial or property loss to another" misstated the law and allowed the jury to convict even if there was not sufficient evidence that they possessed intent to defraud.

Instruction 40, although omitting a clause, did not misstate the controlling law or mislead the jury as to the elements of the offense. First, when the district court orally instructed the jury on the portion of the charge later contained within written Instruction 40, the phrase "for the purpose of causing some financial or property loss to another" was included. More importantly, Instruction 40 advised, in the paragraph following the omitted language:

> [I]n order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and, nonetheless, he associated himself

with the alleged fraudulent scheme *for the purpose of causing some loss to another.*

J.A. 5318 (emphasis added). On the first page of the written instruction, intent to defraud is defined as "to act knowingly and with the specific intent to deceive, for the purposes of causing some financial or property loss to another." J.A. 5316. If the jury found that the defendant lacked that specific intent to defraud, the instruction counseled an acquittal.

Furthermore, as the district court recounted during sentencing, the jury instructions as a whole repeatedly emphasized that the Government had to prove the requisite intent beyond a reasonable doubt. For example, the district court instructed the jury orally that the Government was required to prove that "there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises," J.A. 4460, and that the defendant must have "knowingly, willfully, and voluntarily joined in the scheme, [and] must have participated in the scheme with an intent to defraud someone else." J.A. 4756. Based on the entirety of the jury instructions and the context of the omitted sentence, the charge was not misleading and contained an adequate statement of the law regarding the charged offense.

Appellants also object to the portion of Instruction 40 that stated: "A defendant's belief that the victim of the fraud will be paid in the future or will sustain no economic loss is no defense to the crimes charged in the indictment." J.A. 5318; Appellants' Br. 16-17. This instruction accurately states the proposition that a belief that the victim will be repaid eventually is not a defense to fraud. *See United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993) (approving of identical instruction), *contained in* Model Crim. Jury Instr. 9th Cir. § 3.17 (2003). In sum, we reject Appellants' arguments regarding the sufficiency of evidence for their conviction and whether the district court properly charged the jury.

III.

Allen alleges that the admission of corporate records from Tech Com, produced by Reinhardt in response to a Government subpoena,

incriminated Allen, and because Reinhardt was not subject to cross-examination, violated Allen's rights under *Bruton v. United States*, 391 U.S. 123 (1968). Allen also argues that because of the Tech Com documents, as well as Reinhardt's litigation strategy, the denial of his severance motion constitutes reversible error.

A.

In *Bruton*, the Supreme Court held that where a nontestifying codefendant's statement implicates the defendant, a limiting instruction is inadequate to prevent a violation of the defendant's Confrontation Clause rights. *Id.* at 135-37; *see United States v. Locklear*, 24 F.3d 641, 645 (4th Cir. 1994).

The threshold issue in this case is whether the Tech Com fax cover sheets containing Allen's name were statements by Reinhardt, a nontestifying codefendant. In *Braswell v. United States*, 487 U.S. 99 (1988), the Supreme Court recognized that the act of producing documents pursuant to subpoena could have evidentiary significance. As a consequence, "in a criminal prosecution against the [corporate] custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by one particular individual, the custodian." *Id.* at 118. On the other hand, the government may use the corporation's act of production against the custodian if evidence is adduced from another source that the corporation produced the records. *Id.* In that case, "[b]ecause the jury [was] not told that the defendant produced the records, any nexus between the defendant and the documents results solely from the corporation's act of production and other evidence in the case." *Id.*

In this case, none of the Tech Com documents introduced into evidence before the jury were referred to as documents produced by Reinhardt. The documents were introduced as Tech Com documents, and witnesses testified as to the phone numbers or handwriting that appeared on the documents. Because the jury was never told that Reinhardt produced the Tech Com evidence, there is no act-of-production inference that could have been drawn. *Cf. Braswell*, 487 U.S. at 118. Any link between the Tech Com documents and Reinhardt or Allen resulted solely from other evidence linking the defen-

dants to Tech Com, rather than Reinhardt's act of producing the documents in response to a Government subpoena. *Cf. Id.* Because the jury was not told that Reinhardt produced the Tech Com records, those records were not statements by him. Where there is no introduction of statements by a nontestifying codefendant, *Bruton* is not violated.

B.

We review the district court's rulings on severance and mistrial claims for abuse of discretion. *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002). We review factual findings made in connection with those claims for clear error. *Id.* In *Zafiro v. United States*, the Supreme Court commented that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." 506 U.S. 534, 537 (1993). *Zafiro* noted that joint trials play a vital role in the federal criminal system and promote efficiency while avoiding the possibility of inconsistent verdicts. *Id.* at 573. Accordingly, *Zafiro* concluded that "a district court should grant a severance under Rule 14 [of the Federal Rules of Criminal Procedure] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

This risk might be present where evidence admissible against one codefendant, but not the other, is introduced. *Id.* In a complex case, where codefendants have "markedly different degrees of culpability, this risk of prejudice is heightened." *Id.* Similarly, a defendant may be prejudiced if he could not avail himself of exculpatory evidence in a joint trial that would be available were he tried alone. *Id.*

"[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540. Without a strong showing of prejudice, severance is not justified based on the mere disparity of the evidence adduced against individual defendants. *United States v. Mandel*, 591 F.2d 1347, 1371 (4th Cir.), *vacated en banc on other grounds*, 602 F.2d 653 (4th Cir. 1979). A defendant is not entitled to severance merely because his defense conflicts with or is antagonistic to a codefendant's defense. *Zafiro*, 506 U.S. at 538; *Najjar*, 300 F.3d at 474. This

is true, even where one defendant desires to exculpate himself by inculpating a codefendant. *See Najjar*, 300 F.3d at 474 (citing *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986)). A showing to justify severance

> requires more than finger pointing. There must be such a sharp contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.

*Id.* (quotation marks and citations omitted). This contrast is satisfied where a defendant's guilt is "dictated by the asserted innocence of the co-defendants." *Id.*

Reinhardt's affirmative defense—that the Tech Com transactions were legitimate and that Washington was the individual involved in wrongdoing—was likely more harmful than helpful to both him and Allen. Focusing on the efficacy of the defense, however, overlooks the salient fact that both Reinhardt and Allen employed essentially the same defense: that neither were actually engaged in the charged fraudulent scheme and that Washington and others were the true wrongdoers. Although Reinhardt elected to present witnesses to corroborate his theory of being the innocent dupe to a consummate schemer, Washington, and Allen preferred to rest his innocence on the Government's failure to prove his involvement and the canard that he was a mere clerical employee, there was nothing antagonistic, or even incompatible, about the Appellants' defenses.

An examination of the evidence presented against Allen during the Government's case, as well as the testimony of Reinhardt's defense witnesses, demonstrates that Reinhardt's defense was not so antagonistic to Allen's that to believe one was to disbelieve the core of the other. Reinhardt's asserted innocence in no way dictated a finding of Allen's guilt. Nor did Reinhardt's defense cause the jury to infer unjustifiably that both Allen and Reinhardt were guilty. Examining the testimony of the witnesses presented during Reinhardt's defense corroborates this conclusion. In addition, there was sufficient evi-

dence presented during the Government's case-in-chief to allow the jury to convict Allen.

Allen claims prejudice from a document that was faxed from Allen Freight Systems, a company that he owned, and entered into evidence during the testimony of one of Reinhardt's witnesses. As a result of this document, Allen claims that he was forced to show the jury samples of his own handwriting to establish that he did not fax the document. This, in turn, led the jury to be able to link Allen's handwriting to that on fax cover sheets, in alleged violation of Allen's constitutional rights. This argument ignores that the document was faxed from a company Allen admitted to owning and that the document would have been admissible against him even if he had been tried separately from Reinhardt. Additionally, the Government entered into evidence examples of Allen's handwriting during its case-in-chief in connection with a rental application he submitted. Thus, there was no prejudice to Allen from the entry into evidence of the faxed document from Allen Freight Systems during Reinhardt's affirmative defense.

Reinhardt's defense was not so inherently antagonistic to Allen's defense as to justify severance under the standard set forth in *Najjar*. In addition, Allen has not demonstrated any specific instances of impermissible prejudice from his joint trial with Reinhardt. Thus, we reject his claim that the district court abused its discretion by denying his motions for severance and a mistrial.

IV.

Reinhardt alleges that the district court did not properly inquire as to the validity of a potential defense witness's refusal to testify on the basis of his Fifth Amendment right against self-incrimination and thus violated Reinhardt's Sixth Amendment right to compulsory process. In addition, Reinhardt alleges that the Government engaged in misconduct with regard to the potential witness, Robert Hickman, and requests a remand to develop evidence in that regard. Finally, Reinhardt argues that his counsel's acceptance of Hickman's invocation of the privilege represented constitutionally ineffective assistance of counsel. We reject these arguments in their entirety.

A.

The Fifth Amendment privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The propriety of the invocation of the privilege is not determined by the witness herself, but by the court. *Id.* Because requiring a witness to prove the necessity of the privilege would often vitiate the privilege itself, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 486-87. Because a criminal defendant has a right under the Sixth Amendment to compel testimony, if a defense witness refuses to testify on the basis of the Fifth Amendment, "the trial judge must make a proper and particularized inquiry into the legitimacy and scope of the witness's assertion of the privilege." *Gaskins v. McKellar*, 916 F.2d 941, 950 (4th Cir. 1990). "A witness may be totally excused only if the court finds that he could legitimately refuse to answer any and all relevant questions." *Id.*

In this case, because Reinhardt's counsel accepted Hickman's counsel's assertion that Hickman would invoke his Fifth Amendment privilege, the district court did not err by declining to inquire further, given that it had appointed Hickman counsel on the basis of its threshold belief that there was a valid Fifth Amendment issue. *Cf. United States v. Lee*, 60 Fed. App'x 425, 427 (4th Cir. 2003); *United States v. Ortiz*, 82 F.3d 1066, 1073 (D.C. Cir. 1996) ("We find no plain error as a result of the district court's failure to inquire *sua sponte* whether the witness was entitled to assert a blanket privilege.").

B.

Reinhardt argues that evidence of a communication between Hickman, his counsel, and the Government prior to Hickman's refusal to testify warrants a remand to determine whether the Government's actions violated *Webb v. Texas*, 409 U.S. 94 (1972), or *United States v. Golding*, 168 F.3d 700 (4th Cir. 1999). To prevail on a claim of

prosecutorial misconduct, a defendant must show (1) that the prosecutor's remarks and conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial. *Golding*, 168 F.3d at 702. In this case, there is no evidence whatsoever that the Government acted improperly in any manner. A remand is thus unnecessary to develop any evidence on this claim.

### C.

Reinhardt submits that his trial counsel was constitutionally ineffective by acquiescing in Hickman's refusal to testify on the basis of his Fifth Amendment privilege. Claims of ineffective assistance of counsel are normally raised before the district court via 28 U.S.C. § 2255 and are cognizable on direct appeal only where it conclusively appears on the record that defense counsel did not provide effective representation. *See United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997). The record in this case does not conclusively suggest any prejudice to Reinhardt from Hickman's failure to testify. Thus, Reinhardt's ineffective assistance of counsel claim is not cognizable on direct appeal.

### V.

Allen and Reinhardt argue that the district court's disclosure to the Government of a document containing legal arguments regarding the defense's intended cross-examination of a witness impermissibly intruded upon protected attorney work product and violated their Sixth Amendment rights to effective assistance of counsel. Because the Appellants do not allege any prejudice from the district court's disclosure, and none is apparent from the record, there was no Sixth Amendment violation.

Recognizing that Washington was a key witness and that the defense intended to make extensive use of his prior convictions during cross-examination, the district court ordered the defense to prepare a document detailing the specific prior convictions it intended to introduce, as well as legal arguments supporting such questioning. After defense counsel provided the requested document, the court indicated that it would review the document over the weekend and

then disclose the document the following Monday to the Government, provided that the Government not reveal the document to the Assistant United States Attorney responsible for preparing Washington for his testimony. Defense counsel did not object at this time.

After reviewing the document, the district court ordered the defense to provide a copy to the Government, with the stipulation that it not be shared with the Assistant United States Attorney preparing Washington. At that time, the defense attorney who prepared the document and who intended to cross-examine Washington, who was not present during the previous discussion about the document, objected, claiming that the document was essentially a road map of his cross-examination. Seeking to "avoid having interminable bench conferences," the district court overruled the objection. J.A. 2913.

On appeal, Appellants do not allege any prejudice from the district court's decision to allow a Government attorney to view the document prior to the defense's cross-examination. Nor do Appellants argue that the district court's screening order, which essentially kept the document *ex parte*, at least from the Assistant United States Attorney preparing Washington, was insufficient to prevent prejudice to the Appellants. "[I]t is well settled that some showing of prejudice is a necessary element of a Sixth Amendment claim based on an invasion of the attorney-client relationship." *United States v. Chavez*, 902 F.2d 259, 266 (4th Cir. 1990). Because Appellants do not allege any prejudice from the district court's actions, nor is any prejudice clear from the record, there was no Sixth Amendment violation. The district court took steps to ensure that the document remained screened off from the Assistant United States Attorney responsible for preparing Washington and the defense's cross-examination was not impaired in any respect. Although district courts possess wide discretion with regard to case management, providing the government with documents pertaining to a defense's intended cross-examination risks disclosure of protected work-product and we discourage such orders. In this case, however, we need not reach the issue of whether work product was inherent in the disclosed document because the district court effectively screened the document from the Government's counsel responsible for the witness and the Appellants do not allege that any prejudice resulted from this arrangement. Accordingly, we reject

Appellants' argument that their Sixth Amendment rights were violated.

## VI.

Finally, Reinhardt asserts that the district court committed numerous errors in calculating his sentence. When we review a post-*Booker* sentence of a district court, the overall inquiry is whether the sentence is "within the statutorily prescribed range and is reasonable." *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005). A sentence within the proper Sentencing Guidelines range is presumptively reasonable. *See United States v. Johnson*, 445 F.3d 339, 341 (4th Cir. 2006). "In considering whether a sentence is unreasonable, we . . . review the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006). In reviewing loss calculation, we review de novo the district court's interpretation of what constitutes "loss," while accepting the calculation of loss absent clear error. *Hughes*, 401 F.3d at 557 (reviewing determination of loss under Sentencing Guidelines § 2F1.1(b)(1)).

## A.

Reinhardt argues that the district court abused its discretion by not granting a downward departure because of his family circumstances. Reinhardt's son suffers from two rare genetic disorders, neurofibromatosis and congenital pseudoarthrosis of the left leg. Reinhardt claims that the district court's anger at his sentencing counsel, resulting from their voluminous submissions in connection with sentencing and continued submissions as to Reinhardt's innocence, caused the court to deny the downward departure.

"A district court's decision not to depart from the Sentencing Guidelines is not reviewable unless the court mistakenly believed that it lacked authority to depart." *United States v. Carr*, 271 F.3d 172, 176 (4th Cir. 2001). In this case, the district court acknowledged that it had the ability to grant Reinhardt a downward departure based on his family circumstances, but did not believe that such a departure was warranted. Because the district court understood its ability to depart from the Guidelines, it was "under no misperception as to its

authority, [and] its refusal to depart is not subject to appellate review." *Id.* at 176-77. Accordingly, we cannot disturb the district court's decision not to grant Reinhardt a downward departure based on family circumstances and must dismiss this portion of his appeal.

B.

Reinhardt claims that the district court erred in applying a one-level enhancement for identity theft under § 2F1.1(b)(5)(C)(i). Reinhardt argues that while the evidence is clear that Washington engaged in identity theft, there was no evidence that Reinhardt engaged in such theft, even if he was aware of Washington's actions.

Section 2F1.1(b)(5)(C)(i) of the Guidelines provides for a two-level enhancement if a fraud offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." This subsection applies where a defendant, without authorization, uses an individual's name and social security number or address to obtain a bank loan or credit card. *See* Guidelines § 2F1.1 cmt. 16.; *United States v. Baldwin*, 14 Fed. App'x 192, 196 n.8 (4th Cir. 2001). The subsection has also been held to apply where a defendant, without authorization, uses an individual's information to obtain a lease or open a bank account. *See United States v. Samet*, 200 Fed. App'x 15, 23 (2d Cir. 2006) ("Like the account number of a bank loan, the account number of the leases thus constitute 'means of identification,' and because they were obtained unlawfully, [the defendants'] base offense levels were appropriately enhanced."); *United States v. Norwood*, No. 05-15154, 2006 WL 952330, at *1 (11th Cir. April 13, 2006) ("The names of his mother and uncle were the means of identification. [The defendant] used those means to produce another means of identification: the bank account numbers. Accordingly, the identity theft enhancement applies.").

In this case, the district court applied a one-level enhancement to Reinhardt's sentence under § 2F1.1(b)(5)(C)(I) based on, among other facts, Reinhardt's knowingly processing a lease with Khrlobian containing Khrlobian's wife's social security number and name, which Reinhardt knew were being used without her consent, and Reinhardt's knowledge that Washington's girlfriend had listed her father as guar-

antor on the Variety Cutz leases without his knowledge. In addition, the district court found that the overall fraudulent scheme depended on "dressing up" the lease applications with creditworthy guarantors, regardless of whether permission had been obtained from those individuals.

The evidence adduced at trial reflected the fact that Washington primarily filled out lease applications where guarantors were listed without their knowledge. The evidence involving Khrlobian's wife and Washington's girlfriend demonstrates, however, that Reinhardt was aware in at least two instances of individual's names, driver's licenses, and "credit," including social security numbers, being used without authorization to obtain leases from financing companies. Given this, the district court did not err in applying a one-level identity theft enhancement under § 2F1.1(b)(5)(C)(I) of the Guidelines.

In addition, Reinhardt objects to the inclusion in his loss calculation of two leases arranged by Telcom, another company that he and Washington used as a purported equipment vendor, claiming that there was insufficient evidence that he was involved with Telcom. Given the evidence, the district court did not clearly err in including the Telcom leases in Reinhardt's loss calculation. Even assuming, *arguendo*, that the Telcom leases were wrongly included, those leases only increased the loss calculation by $132,400. The loss calculation due to Reinhardt's conduct was $1,694,164. Reducing this amount by the Telcom lease amount yields $1,561,764, which corresponds to the same offense level as Reinhardt's calculated loss level. *See* Guidelines § 2F1.1(b)(1)(M). Thus, any error with respect to inclusion of the Telcom leases was harmless.

## C.

Reinhardt's remaining objections to his sentencing attack the district court's methodology and his counsel's effectiveness. We summarily reject these arguments.

First, Reinhardt alleges that the district court's "stacking" of two counts to raise Reinhardt's possible maximum sentence from sixty to seventy months was improper, but provides no argument as to why. Under § 5G1.2 of the Guidelines, if a defendant is convicted of multi-

ple counts of an offense and the calculated sentence under the Guidelines exceeds the statutory maximum on one of the counts, the sentence should be imposed consecutively, but only to the extent necessary to produce a combined sentence equal to the calculated sentence. *See United States v. Chase*, 262 F.3d 247, 250-51 (4th Cir. 2002) (explaining "stacking" procedure under § 5G1.2).

Applying the Guidelines, the district court determined Reinhardt's offense level as a 27, with a criminal history in category I, yielding a range of 70 to 87 months. The statutory maximum for each count under 18 U.S.C. § 1343 is sixty months. *See* 18 U.S.C.A. § 1343 (2000). Because the Guidelines range exceeded the statutory maximum for one count, and Reinhardt was convicted of multiple counts under § 1343, the Guidelines allowed the district court to "stack" multiple counts consecutively to achieve a sentence within the Guidelines range. There is no evidence in the record that the district court acted improperly in following the mandate of the Guidelines and increasing Reinhardt's maximum sentence to seventy months. *See United States v. Battle*, 174 Fed. App'x 179, 181-82 (4th Cir. 2006) (approving of post-*Booker* "stacking" under § 5G1.2(d)); *United States v. Smalls*, 185 Fed. App'x 218, 220-21 (4th Cir. 2006) (same).

Next, relying on *United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003), *aff'd on reh'g*, 362 F.3d 160 (2d Cir. 2004), *vacated by*, 543 U.S. 1097 (2005), Reinhardt argues that the cumulation of upward enhancements for more than minimal planning, sophisticated means, and masterminding the scheme in question enhanced his sentence to an impermissible degree. Putting aside the issue of whether *Lauersen* is viable in the Second Circuit following its vacatur by the Supreme Court, it was never the law of this Circuit. Thus, the district court did not err in rejecting Reinhardt's *Lauersen* argument. In addition, the district court did not err in applying separate upward enhancements to Reinhardt's sentence where those enhancements were based on the Guidelines and supported by the evidence.

Reinhardt argues that the sentence imposed by the district court was based on facts not found by the jury and that the district court treated the Guidelines (and enhancements found thereunder) as mandatory, thus violating *Booker* and *Hughes*. The district court did not err in any respect in calculating Reinhardt's sentence; the procedure

followed was in full accord with our precedents and did not treat the Guidelines as mandatory in violation of *Booker*. Accordingly, we reject Reinhardt's argument that his sentence was imposed in violation of *Booker* and *Hughes*.

Finally, Reinhardt claims that his sentencing counsel provided ineffective representation by submitting too many claims to the district court, arguing every conceivable legal point, and submitting evidence that the district court termed "flimflam." Claims of ineffective assistance of counsel are normally raised before the district court via 28 U.S.C. § 2255 and are cognizable on direct appeal only where it conclusively appears on the record that defense counsel did not provide effective representation. *See King*, 119 F.3d at 295.

The record in this case does not conclusively suggest that Reinhardt's counsel was deficient during the sentencing phase. Furthermore, it is not conclusively shown on the record that any deficiency in counsel prejudiced Reinhardt. Accordingly, Reinhardt's ineffective assistance of counsel claim with regard to the sentencing phase of his trial is not cognizable on direct appeal.

In sum, none of Reinhardt's challenges to his sentence are meritorious, and the district court did not err in imposing a sentence of seventy months.

## VII.

For the foregoing reasons, we dismiss Reinhardt's appeal of the district court's failure to grant a downward departure and affirm the convictions and sentences of Reinhardt and Allen in their entirety.

*DISMISSED IN PART;*
*AFFIRMED IN PART*