Filed: September 15, 2006

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 05-5090(L)
(CR-05-3)

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

KENNETH W. CURRY, II,

Defendant - Appellee.

_____

O R D E R

_____

The court amends its opinion filed August 28, 2006, as follows:

On page 2, the third line of the attorney information section is amended by deleting the word "Special" following the name of "Robert John Krask."

For the Court - By Direction

___/s/ Patricia S. Connor___
Clerk

# UNITED STATES OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.

KENNETH W. CURRY, II,
        *Defendant-Appellee.*

No. 05-5090

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

KENNETH W. CURRY, II,
        *Defendant-Appellant.*

No. 05-5173

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Walter D. Kelley, Jr., District Judge.
(CR-05-3)

Argued: May 26, 2006

Decided: August 28, 2006

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Duncan joined.

**COUNSEL**

**ARGUED:** John Staige Davis, V, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Robert John Krask, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for the United States. William Todd Watson, HARGETT & WATSON, P.L.C., Glen Allen, Virginia, for Kenneth W. Curry, II. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for the United States.

---

**OPINION**

GREGORY, Circuit Judge:

On May 31, 2005, after a six-day trial, a jury convicted Kenneth W. Curry, II of thirteen counts of mail fraud, nine counts of wire fraud, and three counts of engaging in unlawful monetary transactions, in violation of 18 U.S.C. §§ 1341, 1343, and 1957, respectively. Thereafter, the district court sentenced Curry to twelve-month terms of incarceration on each count, to be served concurrently and followed by twelve months of home detention and three years of supervised release. The government appealed, claiming that the sentence was unreasonable. Curry cross-appealed, challenging the district court's denial of his motion for judgment of acquittal. For reasons set forth below, we affirm Curry's conviction, but vacate his sentence and remand for resentencing.

I.

In 2000, Curry began using the Internet auction site *eBay* to buy and sell items. Between 2003 and 2004, Curry sold large volumes of coins on *eBay* under the account name "kwciicoins." Curry engaged in thousands of successful transactions, earning an *eBay* positive feedback rating of over 96%.

In the summer and fall of 2004, Curry was on the verge of financial ruin. His security system installation company was over ninety days

past due on a $138,000 debt, and he owed the IRS $98,000. The government contends that Curry turned to his "hobby" of dealing in coins to get out of his financial straits.

At the end of summer 2004, Curry placed up for auction on *eBay* large volumes of one-ounce gold coins, known as "Gold Eagles."[1] Between August and October 2004, Curry sold 381 Gold Eagles to twenty-one different buyers. According to the government, Curry made a series of false representations in his advertisements of the coins. For example, he represented that (1) the coins were located in Virginia Beach, J.A. 786; (2) the coins were "part of a larger estate auction that [would] take about three months to complete," *id.* at 777; (3) the coins were of exceptional quality and likely only to have been seen by the mint or the original buyer, *id.*; and (4) he would provide a full refund to all unhappy buyers, *id.* at 787. The twenty-one buyers paid Curry approximately $148,000 for the 381 coins. Of the 381 coins purchased, Curry delivered only 44 of the coins, which represented only partial deliveries to two purchasers.

In September 2004, one buyer, Charles Clarkson, took Curry to task. Clarkson had paid $16,811 for 43 gold coins in late August 2004. When he discovered that his check had been cashed on September 1, 2004, Clarkson began emailing and telephoning Curry. On September 25, 2004, Clarkson spoke with Curry, telling Curry that if he did not receive a refund, he would come to Virginia Beach and "swear out a complaint and have [Curry] arrested." J.A. 109. Within ten minutes of the call, Curry used PayPal[2] to refund Clarkson's money. *Id.* at 115. Curry paid Clarkson an additional $1,362, purportedly to compensate Clarkson for his troubles, to cover PayPal fees, and to accommodate the increase in the price of gold. *Id.*

Following his interaction with Clarkson, Curry composed an email to most of the remaining gold coin buyers. He wrote, "UPS is still

---

[1]Curry advertised Gold Eagles that had a $50 face value. However, the coins were actually valued at or above the spot market price for gold, which ranged between $390 and $420 per ounce during the relevant period.

[2]PayPal is an Internet service that allows individuals to send and receive funds electronically.

dealing with 83 some odd missing shipments, a solution . . . is not yet available. Other shipments have been delayed while they work this out." *See, e.g.*, J.A. 780. He offered buyers either a refund of their payments, shipping fees, and PayPal fees; or a Gold Maple Leaf coin and Silver Eagle coin for each Gold Eagle ordered. *See, e.g.*, *id.* at 780, 807. In response, some buyers requested refunds and others asked for substitute coins. Rather than send refunds or substitute coins, however, Curry cut off nearly all communication with the buyers.[3]

After receiving a number of complaints, Federal Bureau of Investigation agents conducted a search of Curry's home on December 16, 2004. During the search, agents found a single $20 gold coin. No $50 Gold Eagles were located. Further, the agents discovered records to support the 44 gold coin shipments and various silver coin shipments, but did not locate records showing that Curry had bought coins from an estate. Two receipts, however, showed that he had bought coins from two local coin shops.

The owners of those coin shops testified at trial. They authenticated their respective receipts. Additionally, they testified to the approximate number of coins that they had sold Curry during the interval between August and November 2004. They both denied having sold Curry 381 Gold Eagles.

At trial, Curry explained how UPS was allegedly to blame for the purchasers' non-receipt of the Gold Eagles. Curry attributed all of the problems to events occurring on September 4, 2004. On that day, according to Curry, he took four bags filled with gold coins to a UPS store in Virginia Beach. J.A. 722. He estimated that the bags contained approximately 240 to 416 Gold Eagles, *id.* at 723, presumably worth between $96,000 and $166,000 (assuming a value of $400 per coin). Curry testified that he turned the coins over to store employee Doramae Wright, but that he never received any shipping receipts or tracking information because the store's computer system was then failing. Curry claimed that several weeks later the UPS store owner notified him that his coins had been lost. Nonetheless, Curry never

---

[3]Curry, however, maintains that full or partial refunds were given to a host of buyers. Most of those individuals, however, are not involved in this action.

availed himself of UPS's formal complaint procedures. And, a search of the store's and UPS's computerized records did not locate any shipments from Curry to the buyers, save the partial shipments, and the records revealed that all of Curry's shipments between June and December 2004 had been delivered.

At the close of trial, the government moved to dismiss two counts, and the jury returned a guilty verdict on the remaining counts. Thereafter, Curry filed a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the district court subsequently denied.

On September 19, 2005, the district court conducted a lengthy sentencing hearing. At that time, the court heard arguments regarding the Presentence Investigation Report (PSR), which calculated an offense level of 24 and criminal history category of one, resulting in a U.S. Sentencing Guidelines range of 51 to 63 months. The court overruled most of Curry's objections to the PSR, including Curry's objection to the obstruction of justice enhancement, finding by a preponderance of the evidence that Curry committed perjury in his testimony regarding his delivery of several hundred gold coins to a UPS store on September 4, 2004. The court, however, sustained Curry's objection to the enhancement for representing that he was acting on behalf of a charitable organization, stating that the enhancement is typically reserved for instances in which the representation induced a purchase or a gift. Accordingly, the district court adjusted the offense level to 22, which resulted in a Guidelines range of 41 to 51 months. J.A. 1103-04, 1204.

The United States argued for a sentence within the Guidelines range, whereas Curry asked that his efforts toward restitution be taken into account in arriving at a sentence. Curry turned over a $42,000 check derived from the sale of his house and agreed to have the funds from his posting of bond applied to restitution.

Although the Guidelines recommended a term of imprisonment between 41 and 51 months, the district court sentenced Curry to twelve-month concurrent sentences on each count; twelve months of home confinement following his release from prison; supervised release for three years; $122,965.46 in restitution; a $7500 fine; and

a $2500 special assessment. The court arrived at this variance sentence because it was impressed with Curry's payment of restitution, J.A. 1123, and believed that Curry did not "set out to run a scam," *id.* at 1121, and "had every intention of giving the money back," *id.* at 1122. Although the government had strenuously argued for a within-Guidelines sentence during the sentencing hearing, it did not raise a formal objection after the district court imposed its below-Guidelines sentence. This appeal and cross-appeal followed.

## II.

In reviewing Curry's sufficiency of the evidence claim, this Court must determine whether, construing the evidence in the light most favorable to the government, any reasonable trier of fact could have found Curry guilty beyond a reasonable doubt. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). In making this determination, the government is given "the benefit of all reasonable inferences from the facts proven to those sought to be established." *Id.* Thus, "if the record reflects that the Government presented substantial evidence from which a reasonable jury could convict, we must uphold the verdict." *United States v. Godwin*, 272 F.3d 659, 666 (4th Cir. 2001). Moreover, "[w]here there are conflicts in the testimony, it is for the jury and not the appellate court to weigh the evidence and judge the credibility of the witnesses." *Id.*

When viewed in the light most favorable to the government, the evidence is sufficient to sustain the jury verdict. Mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 have two essential elements: (1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme. *See Godwin*, 272 F.3d at 666; *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995). The logical conclusion to be drawn from the absence of *any* proof that Curry ever possessed 381 Gold Eagles and Curry's failure to file a formal complaint when UPS allegedly lost $96,000 to $166,000 in Gold Eagles, is that Curry never possessed a large volume of Gold Eagles for sale. Thus, each time Curry sent a wire communication to facilitate the sale of a phantom Gold Eagle or accepted a payment by mail for a nonexistent Gold Eagle, he committed wire or mail fraud. Likewise, when he engaged in well-documented monetary transactions involving sums in excess of $10,000 derived from

his sale of fictitious Gold Eagles, he violated 18 U.S.C. § 1957. *United States v. Smith*, 44 F.3d 1259, 1270 (4th Cir. 1995) ("Section 1957 requires a showing that [the defendant] knowingly engaged in a monetary transaction involving criminally derived property with a value greater than $ 10,000 . . . ."). Therefore, we believe a reasonable jury could have convicted Curry of the crimes charged based on the evidence adduced at trial.

None of Curry's arguments on appeal persuade us otherwise. Curry argues that his convictions must be set aside because there was insufficient evidence to support a finding of intent to defraud, an essential element of his mail and wire fraud convictions. He contends that two facts undermine the assertion that he intended to defraud the purchasers: (1) the government did not show when the alleged scheme was devised, and (2) he issued refunds to several buyers. Both of these arguments fail.

Curry misstates the law when he suggests that the government had a burden of proving precisely when the scheme to defraud was concocted. As set forth above, mail fraud and wire fraud have only two essential elements—the existence of a scheme to defraud and the use of the mails or wire communication in furtherance of the scheme. Thus, neither the wire fraud nor mail fraud statute requires that the government prove precisely when the intent to defraud first materialized. Moreover, even if an individual had an innocent intent at the outset, a mail or wire fraud conviction can be sustained if that individual used the mails or wire communication to disseminate falsehoods designed to calm nervous buyers, as Curry did here. *See, e.g.*, *Godwin*, 272 F.3d at 667 ("[A] reasonable jury could conclude that even if Godwin and Curry-Robinson had originally harbored good intentions, when their financial expectations soured they engaged in fraudulent activity to placate unhappy investors and prolong their scheme to defraud.").

Curry's contention that his refund history suggests good faith also fails. The intent to repay eventually is irrelevant to the question of guilt for fraud. *See United States v. Painter*, 314 F.2d 939, 943 (4th Cir. 1963) ("[N]o amount of honest belief that his corporate enterprise would eventually succeed can excuse the willful misrepresentations by which the investors' funds were obtained. An investor may be

defrauded if his reliance is induced by deliberately false statements of fact, and the defendant's optimism as to the future is no defense."); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank . . . ."). Because it appears that Curry never possessed the coins, he committed fraud each time he represented otherwise and accepted money from buyers. And, his subsequent refunds cannot absolve him of responsibility for consummated acts of fraud.[4]

Accordingly, we conclude that the district court did not err in denying Curry's motion for judgment of acquittal. As the district court noted via its rhetorical question, "there [were] circumstances here, everything from the jury not believing the story about dropping the coins off to telling people that they had been mailed and so on, that [led] the jury to conclude that he had set out to do this all along[.]" J.A. 1023-24. We affirm Curry's convictions.

## III.

### A.

We now consider whether the district court erred in assigning a sentence well below the Guidelines range. We begin with the threshold question of standard of review. Curry argues that we should review the sentence for plain error, because the government did not object to the sentence when announced. We disagree.

---

[4]Curry also vaguely asserts that the fact that UPS mishandled one package of coins shipped on September 4, 2004, somehow renders the evidence insufficient to sustain the jury's verdict. We are not persuaded. The fact that UPS mishandled, but ultimately delivered, a single shipment of three gold coins does not require a jury to believe that UPS permanently lost eighty other shipments that collectively contained several hundred coins. Indeed, as discussed above, the evidence suggests that Curry never possessed a large volume of Gold Eagles.

The government preserved its objection to the sentence by vigorously arguing for a sentence within the Guidelines range throughout the sentencing hearing. *See* Fed. R. of Crim. P. 51(b) ("A party may preserve a claim of error by informing the court—when the court ruling or order is made *or sought*—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." (emphasis added)). During a three-hour sentencing hearing, the government responded to every argument the defendant offered for a sentence below that recommended in the PSR. The government requested a "substantial" sentence, because Curry engaged in serious Internet crimes that disrupted the lives of many different individuals from varied walks of life. J.A. 1108.

Further, the government made its position known with respect to the effect of restitution. Although the government indicated that Curry deserved some credit for his restitution, J.A. 1109, it noted that Curry did not pay restitution before being charged and convicted, and did not turn over proceeds from the sale of his house without prompting, *id.* at 1110. Given all the sentencing factors, "including Mr. Curry's background, the seriousness of his crime, the restitution to be paid, the fact that he took the stand and lied at trial and even now is unable to come to grips with his misconduct, [the government] ask[ed] the Court to sentence the defendant within the guideline range." *Id.*

In this regard, the government made unmistakably clear its position regarding Curry's sentence. That the government did not restate its position after the sentence was announced, by lodging a futile objection at the end of the sentencing colloquy, is without consequence. *See United States v. Shumard*, 120 F.3d 339, 340 (2d Cir. 1997) ("Appellee argues that the government has waived these claims by failing to object to the district court's ruling at sentencing. . . . In this case, the government argued each of these claims at the sentencing hearing prior to the district court's disputed ruling. In these circumstances, the government clearly preserved these claims for appellate review."); *see also United States v. Clark*, 434 F.3d 684, 686 n.1 (4th Cir. 2006). Indeed, the district court knew that the government would be displeased with the sentence, saying "I may aggravate the government by [announcing a variance sentence], but it seems to me under these circumstances *the issue seems to be doing some time rather than how much time*." J.A. 1123 (emphasis added). Thus, we conclude that

the government properly preserved its claim and reject Curry's contention that plain error review applies.[5]

## B.

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), which rendered the Sentencing Guidelines advisory, *see id.* at 245, a district court must:

> (1) properly calculate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the factors set forth in [18 U.S.C.] § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guideline range better serves the relevant sentencing purposes set forth in § 3553(a).

*United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). An appellate court, in turn, reviews a district court's sentence for unreasonableness, *see Booker*, 543 U.S. at 261, which "will largely depend upon the specific facts of each case and the district court's consideration and application of the § 3553(a) factors to those facts." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006). A sentence "based on an error in construing or applying the Guidelines, . . . will be found unreasonable and vacated." *Green*, 436 F.3d at 457. Likewise, a sentence will be vacated if it is "imposed outside the Guideline range and the district court provides an inadequate statement of reasons or relies on improper factors in departing from the Guidelines's recommendation." *Id.* Finally, we have instructed that

> when the variance is a substantial one—such as the two-thirds reduction from the bottom of the advisory guideline

---

[5]Curry's reliance on *United States v. Barajas-Nunez*, 91 F.3d 826 (6th Cir. 1996) is misplaced because in that case, "the government failed to give the district court any inkling that it disagreed with the departure." *Id.* at 830.

range that is at issue—we must more carefully scruti-
nize the reasoning offered by the district court in support of
the sentence. The farther the court diverges from the advi-
sory guideline range, the more compelling the reasons for
the divergence must be.

*United States v. Moreland*, 437 F.3d 424, 434 (4th Cir. 2006).

It is against this backdrop that we consider the district court's rea-
sons for assigning a variance sentence. First, the district court
expressed its view that Curry did not at the outset intend to defraud
the buyers. The court stated, "it was my conclusion from listening to
the facts that this didn't start out as a scam, but somehow or another
it ended up as one from the standpoint of using people's money that
had been given to you for other purposes." J.A. 1122. The court
explained that "in looking at the sentencing factors, I think I need to
consider the case differently . . . than where somebody had come up
with a scheme to use [*eBay*] from the inception to scam a bunch of
people out of money . . . ." *Id.* at 1122. Second, the court also gave
great weight to Curry's efforts at restitution, saying "I'm also guided
by the need to pay restitution. I think it's very important that you have
stepped forward to do that. That impresses me a great deal, because
amazingly enough, most people don't. . . . You have stepped forward
and done that, so I think that's very meaningful." *Id.* at 1123. As set
forth below, we find these reasons insufficient to support the variance
sentence assigned here.

*First*, we agree with the government's assertion that the court's
sentence runs counter to the weight of the evidence and the jury's ver-
dict. By basing its decision to vary downward in large part on a belief
that Curry did not set out to defraud the buyers, the court contradicted
the weight of evidence and the verdict. *See United States v. Weston*,
960 F.2d 212, 218 (1st Cir. 1992) ("[A] guilty verdict, not set aside,
binds the sentencing court to accept the facts necessarily implicit in
the verdict."); *see also United States v. Hourihan*, 66 F.3d 458, 465
(2d Cir. 1995).

By ruling as it did, the jury necessarily decided that Curry did not
leave a large volume of coins at the UPS store on September 4, 2004.
Indeed, as the court observed, "if the jury had believed the UPS story,

that would have been completely exculpatory, wouldn't it?" J.A. 1082. The court explained that Curry "couldn't have possibly had a scheme to defraud if he actually sent the coins, could he?" *Id.* at 1083. Thus, implicit in the jury's verdict is the conclusion that Curry did not deliver coins to UPS on September 4, 2004, and thus never had 381 Gold Eagles at his disposal for sale. The district court was bound "to accept th[is] fact[ ] necessarily implicit in the verdict." *Weston*, 960 F.2d at 218. The court erred, therefore, in sentencing Curry based on a conclusion that contravened the jury's verdict.

*Second*, we find that Curry's restitution is by itself insufficient to justify the 70% variance at issue. As we have previously stated, "[t]he farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be." *Moreland*, 437 F.3d at 434. On this record, we do not find the payment of restitution so compelling. Curry did not begin making restitution until the jury convicted him of the charges. Thus, in paying restitution, he was not accepting responsibility for his actions, far from it. Curry always maintained his innocence, even at the risk of perjuring himself, and required the government to undertake a time-consuming trial. Further, in making some payments of restitution before sentencing, Curry merely complied with an order of restitution that he likely knew was forthcoming. And, even if defendants rarely make full restitution, we nonetheless expect—and need not substantially reward—compliance with court orders. Thus, although Curry's restitution may be worthy of some consideration in the sentencing determination, it does not justify so large a variance from the advisory Guidelines range.

IV.

For the reasons stated above, we affirm Curry's conviction, but vacate his sentence and remand for resentencing.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*