**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 06-4971**

———————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

TIMOTHY FENNON SAMPSON,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the Western
District of Virginia, at Charlottesville. Norman K. Moon, District
Judge. (3:05-cr-00011-nkm)

———————————

Submitted: July 18, 2007          Decided: August 23, 2007

———————————

Before MICHAEL and KING, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

———————————

Affirmed by unpublished per curiam opinion.

———————————

John E. Davidson, DAVIDSON & KITZMANN, PLC, Charlottesville,
Virginia, for Appellant. John L. Brownlee, United States Attorney,
William F. Gould, Assistant United States Attorney,
Charlottesville, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Timothy Fennon Sampson was convicted by a jury of conspiracy to commit perjury, 18 U.S.C. § 371 (2000) (Count 1); perjury and subornation of perjury, 18 U.S.C. § 1622 (2000) (Counts 2 and 4); and providing materially false statements to the judiciary, 18 U.S.C.A. § 1001 (West 2000 & Supp. 2007) (Count 3). The court imposed a variance sentence of twenty years of imprisonment, going above the advisory guideline range of 108-135 months after first deciding that an upward departure pursuant to U.S. Sentencing Guidelines Manual § 4A1.3, p.s. (2005), to a range of 151-188 months would not adequately serve the factors set out in 18 U.S.C.A. § 3553(a) (West 2000 & Supp. 2007). Sampson appeals his sentence, contending that the court incorrectly determined the advisory guideline range in the first place and that the variance sentence was unreasonable because the court based its decision to vary on his supposed involvement with several murders and other crimes for which he had not been convicted. We affirm.

Sampson's conviction resulted from his attempt to portray himself as a witness to the murders of Mary and Michael Short in Henry County, Virginia, and the abduction of their daughter. The daughter's body was found a month later in Rockingham County, North Carolina. A year after the murders, Sampson contacted the Rockingham County Sheriff's Department and claimed to have been behind the Short house looking for items to steal when the murders

occurred. Sampson said he had seen a person bring a weapon out of the house and then a child, and that the person looked like Abraham Lincoln. This was significant because, at the time, authorities had identified a "person of interest," who had a beard and had been described as resembling Lincoln. On October 7, 2003, Sampson testified before a grand jury in Charlottesville, Virginia, that he had been traveling from Greensboro, North Carolina, to Roanoke, Virginia, in a Ford van with a friend named "Bobby" on the night of the murders, had stopped to urinate, went behind the Shorts' house looking for items to steal, and heard several shots. He said he heard a child say "No, no," and then saw a man come out of the house, first with a weapon, then carrying a child.

On November 5, 2003, Sampson accompanied his daughter, Beth Braxton, to Charlottesville, where she testified before the grand jury that, when Sampson came home on the day of the murders, he was "shaking and crying" and told her "he had just seen someone get killed." Beth Braxton had not met her father until she was eighteen years old, in late 2000, when she moved in with Sampson and his girlfriend, Dawn Phillips. A month later, Phillips disappeared. During the following year, Sampson entered into an incestuous relationship with Braxton, which she said began when he raped her at knifepoint, and which produced a child in March 2003.

On the same day that Braxton testified before the grand jury, Sampson was interviewed by Major Kimmi Nester of the Henry

County Sheriff's Office and other law enforcement officers. In the course of the interview, Sampson volunteered that he had shot and killed a man who had sex with Dawn Phillips, and burned the man's body. He also told the officers he had seen Phillips' dead body wrapped in a rug from his own residence, but he denied having killed Phillips.

Shortly after this interview, Sampson persuaded a friend, Jerry Mills, to say that he had driven Sampson to Virginia on the night of the Short murders, using the name "Bob" while in Virginia. Sampson suggested to Mills that it might be a way for him to obtain lenient treatment on the habitual offender charge he was facing. To prepare Mills, Sampson drove him to Henry County to show him the murder site and rehearse his story. Mills' interview with members of the task force investigating the Short murders took place on December 17, 2003, at Mills' attorney's office in Greensboro. Mills testified before the grand jury in Charlottesville on April 28, 2004. At trial, Mills testified that his grand jury testimony was untrue.

At Sampson's request, Mills also asked a mutual friend, Michael Holland, to tell Federal Bureau of Investigation (FBI) investigators that he sold Mills a Ford van, then took the vehicle back and had it crushed. Holland initially complied when he was questioned on December 18, 2003, but when he learned that the FBI was working on the Short case, he immediately called the

- 4 -

investigators and told them he had been instructed to say what he did. On December 21, 2003, Sampson called both Captain Bobby Lawson, of the Rockingham County Sheriff's Office, and Nester, and complained that investigators had been in Greensboro. He told Lawson he had received death threats and had a gun stuck down his throat. He said, "[Y]ou come up here and I'll stick a gun down your 'GD' throat and blow your 'M F'n' head off." To Nester, in a cell phone call that was interrupted numerous times, Sampson said he would "use a weapon to blow [their] Goddamn, motherfucking heads off."

On February 10, 2004, both Mills and Holland were scheduled for separate interviews at the FBI office in Greensboro. Sampson came with Mills, although he had not been invited to appear. Mills' interview lasted longer than expected, with the result that, when Mills and Sampson were leaving, they encountered Holland at the elevator. According to Holland, words were exchanged and Sampson "punched and hit" him. Mills testified that he left a few minutes before Sampson and, when Sampson came out of the building, Sampson said he had met Holland and had hit him.

On July 20, 2004, Sampson was arrested and charged with the murder of Dawn Phillips. On August 11, 2004, Beth Braxton testified a second time before the grand jury and recanted the testimony she gave previously. At trial, she testified that, in her first grand jury testimony, she said what Sampson told her to

- 5 -

say.  She said that when Phillips disappeared, Sampson took her to a hotel that night, engaged in an elaborate carpet cleaning at his home the next day, and finally removed the carpet altogether.  She also testified that he later told her that he killed Dawn Phillips and described in detail how he did it.  Braxton also related that Sampson told her that he had hit his former wife, Donna Slayton, in the face with a hammer.

Braxton described how Sampson punched her in the face and cut her arm in 2002 when she said she was sorry she had met him and wanted to separate from him.  She read from a letter she received from Sampson after he was arrested in which he threatened to disclose her incestuous relationship with him.  She said it made her feel that if she didn't help him she would lose her freedom and her child and "everything [she] had ever done wrong would be out in the open for everyone to know."

After Sampson's conviction, the probation officer recommended a base offense level of 14, U.S. Sentencing Guidelines Manual § 2J1.3 (2005), with an 8-level enhancement for causing or threatening to cause physical injury to a person to suborn perjury under § 2J1.3(b)(1), and a 3-level enhancement for substantial interference with the administration of justice under § 2J1.3(b)(2).  The probation officer also recommended a 2-level adjustment for having an aggravated role in a criminal activity involving fewer than five persons under USSG § 3B1.1(c), and a 2-

level adjustment for obstruction of justice under USSG § 3C1.1. The recommended offense level was 29. Sampson was in criminal history category III. His recommended advisory guideline range was 108-135 months. The probation officer suggested that an upward departure might be warranted under USSG § 4A1.3, p.s. (Inadequate Criminal History Category).

The government moved for an upward departure under § 4A1.3, requesting the statutory maximum sentence of twenty years under 18 U.S.C.A. § 3553 (West 2000 & Supp. 2007), based in part on Sampson's admissions during his discussions with law enforcement officers. The government noted that charges were pending against Sampson in North Carolina for the murder of Dawn Phillips and that he also had larceny charges pending. The government argued that Sampson would always be a danger to the community. Sampson contested all the recommended enhancements and adjustments, and opposed a departure.

At the sentencing hearing, the district court overruled Sampson's objections to the presentence report. With respect to the requested upward departure, the government called Rockingham County Sheriff's Department Deputy Perry Brookshire, who testified that, in an interview on November 5, 2003, Sampson volunteered that he had seen Dawn Phillips' body wrapped in a blanket that had come from his residence, talked to the person who killed her, killed an African-American male who was at the scene where Phillips was

murdered, and burned the man's body.  Sampson also stated that he had testified in the trial of John Malone, Jr., who was acquitted of the 1991 murder of his stepmother, Colby Malone.  Sampson admitted he had been involved in a plan to rob Colby Malone, but said he backed out of it, although he helped to hide the murder weapon.  Brookshire testified that Sampson's DNA had recently been discovered on a pair of gloves that were found at the crime scene.

Brookshire further testified that Sampson had been convicted of insurance fraud after a house he owned burned.  During the investigation, the body of an Hispanic male was found about a mile from Sampson's residence.  The man, who was never identified, had been shot in the head and burned beyond recognition. Brookshire testified that Sampson stated he married Donna Slayton so that she could not testify against him concerning some staged break-ins that occurred during this time.[1]  Finally, Brookshire testified that, because of Sampson's conduct during the investigation of the Short case, approximately 1000 additional hours of investigation were expended.  The government asked the court "to not only depart from the guideline range, but vary, based

---

[1]Sampson was convicted of insurance fraud relating to the staged break-ins in 1994.

on Blakely[2] and Booker[3], up to the statutory maximum, which is 240 months."

The district court agreed with the government and the probation officer that Sampson's criminal history was under-represented by category III. The court concluded that, if all Sampson's criminal conduct were counted in his criminal history, Sampson would be in category VI. However, the court decided that a departure to category VI would not result in a sentence sufficient to protect the public from future crimes by Sampson. Therefore, the court imposed a variance sentence of 240 months by imposing consecutive sentences on each of the four counts of conviction.

### Upward Variance

In this appeal, Sampson first challenges the district court's divergence from the guideline range. A sentence is reviewed for reasonableness. Booker, 543 U.S. at 261; United States v. Tucker, 473 F.3d 556, 560 (4th Cir. 2007). It is the district court's responsibility to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of § 3553(a). Tucker, 473 F.3d at 561. If the appeals court concludes that the sentence achieves this goal, the sentence may be affirmed as reasonable. Id. To this end, the sentencing court

---

[2]Blakely v. Washington, 542 U.S. 296 (2004).

[3]United States v. Booker, 543 U.S. 220 (2005).

should correctly determine the advisory guideline range and decide whether a sentence within the range serves the factors set out in § 3553(a).  Id.  If not, the court should first determine whether a departure is warranted.  Id.  If the court finds that the departure range is still inadequate, the court may impose a variance sentence.  Id. at 560-61.  When reviewing a variance sentence, the appeals court considers "whether the sentencing court acted reasonably both with respect to its decision to impose such a sentence and with respect to the extent of the divergence from the sentencing range."  United States v. Hernandez-Villanueva, 473 F.3d 118, 123 (4th Cir. 2007) (citations omitted).

Here, the district court did not state whether it intended the sentence to be a departure or a variance.  However, the court's explanation for the sentence indicates that it believed a criminal history departure could not produce a 240-month sentence, which was the sentence it had determined was the only appropriate sentence.  Therefore, the sentence should be viewed as a variance.  In light of Sampson's pending charge for the murder of Dawn Phillips, a crime he had admitted to Braxton, his admission that he had murdered an unidentified African-American man, and his involvement with the murder of Colby Malone, we conclude that the district court's decision to impose a variance sentence, and to impose the statutory maximum on each count, was reasonable.

Sampson argues that the court erred by giving excessive weight to the goal of protecting the public from future crimes he might commit. However, "[t]he district court need not discuss each factor set forth in § 3553(a) 'in checklist fashion;' 'it is enough to calculate the range accurately and explain why (if the sentence lies outside it) this defendant deserves more or less.'" United States v. Moreland, 437 F.3d 424, 432 (4th Cir.) (quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005)), cert. denied, 126 S. Ct. 2054 (2006). The district court here clearly considered the other § 3553(a) factors, as evidenced by its statement that "none of the factors in § 3553(a) mitigate against anything but the maximum sentence the Court could possibly impose."

Relying on United States v. Curry, 461 F.3d 452, 461 (4th Cir. 2006), Sampson also maintains that the increased sentence was based on the court's assessment of his "supposedly violent nature," and thus is contrary to the jury's decision to acquit him of "the threat charges, the only violent crimes with which Mr. Sampson was charged in this case." In Curry, this court held that a downward variance of 70% from the advisory guideline range was unreasonable, in part because the district court based its decision to vary downward on its belief that the defendant had not initially planned to defraud the victims, a conclusion that "contradicted the weight of evidence and the verdict." Id. at 460-61.

Sampson's reliance on Curry is misplaced. First, the district court concluded that Sampson was a dangerous person mainly because of his involvement with several murders and his conduct toward his daughter, rather than because of his threats to Nester and Lawson. Long-standing authority permits the sentencing court to consider any evidence at sentencing that "has sufficient indicia of reliability," see USSG § 6A1.3(a), including "conduct underlying [an] acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." United States v. Watts, 519 U.S. 148, 156-57 (1997) (per curiam); United States v. Montgomery, 262 F.3d 233, 249 (4th Cir. 2001). Here, in contrast to Curry, the weight of the evidence supported the court's conclusion that Sampson was a dangerous person. To the extent that the court based its decision on Sampson's threats to the officers, the evidence supported the court's finding. Nester and Lawson testified that Sampson threatened them. Sampson did not testify. In acquitting Sampson of making threats to impede the administration of justice, the jury did not necessarily decide that Sampson was innocent of making the threats, but only that he did not do so with the intent of obstructing justice. Therefore, we are satisfied that Sampson has not shown that the court's decision to vary upward to the statutory maximum was procedurally or substantively unreasonable.

### USSG § 2J1.3(b)(1) Enhancement

The district court did not explain its decision to apply the 8-level enhancement under USSG § 2J1.3(b)(1) for an "offense involved causing or threatening to cause physical injury, or property damage, in order to suborn perjury." The presentence report and the government offered the following potential bases for the enhancement: (1) Sampson's threats to and intimidation of Braxton, in particular, raping her, telling her what he did to his former wife and girlfriend, threatening her after his arrest with loss of her freedom and her child; (2) Sampson's assault on Holland in the FBI building; and (3) Sampson's threats to Nester and Lawson.

We agree with Sampson that there was no evidence he explicitly threatened anyone with physical injury or property damage to suborn their perjury. However, we are satisfied that the enhancement was justified based on the implied threat to Braxton. She testified that, during the time she lived with Sampson, "[i]t was understood that he was in control. If my behavior was what he wanted, everything was all right. But if I behaved in a way that he did not like, then I would be punished for it." She testified that their sexual relationship began when he raped her at knifepoint. He told her in detail how he killed Dawn Phillips and how he hit his former wife, Donna Slayton, in the face with a hammer. Braxton said these revelations "made me feel like he is in control and if he's not in control, he will get you in control."

- 13 -

Braxton also experienced violence from Sampson in addition to the rape.  She testified that, in October 2002, after she and Sampson had both been drinking and using drugs at a bar, she told him that she wished she had never met him, that her life had gone from bad to worse after she met him, and that she didn't want to see him anymore.  Sampson punched her in the face several times and, when she put her arm up to protect herself, cut her on the arm.  The cut required sixteen stitches.

Braxton testified that, when Sampson told her about his plan to claim to be a witness to the Short murders, she said she wanted no part of it.  She later testified before the grand jury and "said what Timothy told me to say."  Although she was not apparently induced to commit perjury by any overt threat, an implied threat is enough to warrant the enhancement. See United States v. Loudon, 385 F.3d 795, 799 (2d Cir. 2004) (affirming similar 8-level enhancement under USSG § 2J1.2(b)(1) for implied threat made with intent of obstructing justice).  Because, during the time-frame of the offense, Braxton was living in an atmosphere of continual implied threats of physical violence from Sampson, we conclude that the enhancement was correctly applied.

### USSG § 2J1.3(b)(2) Enhancement

There was ample support for a 3-level enhancement under § 2J1.3(b)(2) for substantial interference with the administration of justice, which includes "the unnecessary expenditure of

substantial government or court resources."  Nester testified at trial that as much as 1000 extra man hours were expended because of Sampson's actions and false claims.

## USSG § 3B1.1(c) Adjustment

The evidence supported a finding that Sampson had an aggravated role in the conspiracy to commit perjury.  He originated the scheme to claim falsely that he was a witness to the Short murders, and recruited Mills and Braxton to assist him, as well as Holland, for a brief time.  Even though Mills was a willing participant, Sampson was the leader and organizer of the conspiracy.  The adjustment was not clearly erroneous.

## USSG § 3C1.1 Adjustment

Finally, the district court did not clearly err in applying an adjustment for obstruction of justice, § 3C1.1, based on Sampson's threatening phone calls to Nester and Lawson.  The adjustment does not apply when the defendant has been convicted of perjury unless "a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself . . . ."  USSG § 3C1.1, comment. (n.7).  Sampson argues that the adjustment was impermissible double counting.  However, Sampson's threats to the officers were not part of the offense of conviction.  The district court found by a preponderance of the evidence that the threats were an attempt by Sampson, however short-lived, to obstruct the investigation of his perjury

and the related conspiracy. Thus, the adjustment did not constitute impermissible double counting.

Sampson also contends that the adjustment was contrary to the jury's verdict, which acquitted him of making threats to the officers with the intent of impeding the administration of justice. As previously discussed, the sentencing court may consider "conduct underlying [an] acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." Watts, 519 U.S. at 156-57; Montgomery, 262 F.3d at 249. Sampson again relies on Curry, but here again the weight of the evidence supports the district court's finding.

We therefore affirm the sentence imposed by the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED