**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4818**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

DIANE W. PACE,

Defendant – Appellee.

-----------------------------------

BRENT EARL WOOD,

Amicus Supporting Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at New Bern.  Terrence W. Boyle, District Judge.  (5:05-cr-00044-BO)

Argued: January 30, 2009                Decided: March 4, 2009

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

**ARGUED:** Anne Margaret Hayes, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellant.  Robert Daniel Boyce, BOYCE & ISLEY, P.A., Raleigh, North Carolina, for Appellee.  **ON BRIEF:** George E. B. Holding, United States Attorney, J. Gaston B. Williams, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North

Carolina, for Appellant.  Brent Earl Wood, Cary, North Carolina, Amicus Supporting Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The United States appeals from a judgment of acquittal and conditional new trial granted to Diane Pace after a jury convicted her of eight charges relating to fraudulent misrepresentations made to investors in a venture capital fund. Despite the jury's verdict, the district court found the Government's evidence insufficient as a matter of law to sustain Pace's convictions. For this reason, the district court granted Pace a judgment of acquittal and, in the event of a reversal of this judgment, a new trial. Because substantial evidence in the record supports the jury's verdict that Pace acted with an intent to defraud investors, we reverse both the judgment of acquittal and the conditional grant of a new trial, and remand the case for sentencing.

I.

A.

Between 1996 and 2000, Stanley Van Etten formed several venture capital companies based in Raleigh, North Carolina, under the name "Mayflower Venture Capital" (Mayflower). Two of these companies, Mayflower Funds I and II, solicited money to invest in various "portfolio companies," which ranged from magazines to Internet start-ups. This case centers on Mayflower Fund III, which a five-member committee managed. These five

Mayflower Fund Managers were Diane Pace, who had a securities background, an attorney (Brent Wood), a CPA (Tom Eilers), and two salesmen (John Brothers and Scott Pollack) (collectively, the "Fund Managers").

One of the Mayflower portfolio companies was BuildNet, a private software firm with products designed to coordinate aspects of the home-building industry. Both Fund I and Fund II invested in BuildNet. On March 20, 2000,[1] BuildNet registered with the SEC in preparation for a highly-anticipated initial public offering (IPO).

Mayflower investors were eager to participate in the BuildNet IPO, and Mayflower had leverage from its previous investments in BuildNet. On March 10, a letter from the Fund Managers informed Fund I and II investors that Mayflower was in the process of putting together Fund III "to take advantage of . . . the success surrounding BuildNet." A March 29 letter from Van Etten and Pace informed investors that Fund III would have the "primary purpose" of purchasing BuildNet IPO shares. It explained that Fund III was open only to Fund I and II investors and that "[a]ny funds not used to purchase [BuildNet] IPO shares . . . will be returned to the 'lenders' within 60 days from the effective date of the BuildNet IPO," or within 60 days if

---

[1] Hereinafter, all dates are from 2000 unless otherwise indicated.

4

BuildNet withdrew its SEC registration.

The following day, Van Etten sent an internal memorandum to the Fund Managers. This March 30 memorandum explained:

> All of the money being depositing into Fund III is a loan. These funds will be used to manage the short-term cash flow obligations [of Fund III] as well as to pay for all BuildNet IPO shares. . . . [A]ny money not invested in BuildNet will be returned to the investor[s] . . . .

The Government maintains that this memorandum evidences Van Etten's plan to use the Fund III money not solely for the BuildNet IPO, but as, essentially, a bridge loan for Mayflower until the IPO went through.

                                B.

The Fund Managers sent several letters to Fund III investors over the coming few months, updating them on the progress of the BuildNet IPO and the status of their investments. The Government maintained at trial that these documents created and perpetuated a belief by investors that Fund III money was to be used solely for the BuildNet IPO or else returned -- when, in fact, Mayflower invested this money in other companies.

In a May 3 "Update Memorandum," the Fund Managers explained that they believed that the BuildNet IPO remained "on-track" and informed investors that the formal legal documentation for Fund III would be forthcoming. It went on to explain that Fund III

investors would soon be asked whether they wished to convert their loan into preferred units, which "will be used to invest in the BuildNet IPO."

The May 13 "Term Sheet" -- sent by Van Etten and Pace to Mayflower investors, with Wood listed as "Securities Counsel" -- offered a summary of the terms of Fund III. It distinguished between common units in Fund III, which had rights "in all Fund III investments," and preferred units, which had "equal rights and pro-rata beneficial ownership rights exclusively in the BuildNet IPO, which will be cashed out and distributed once BuildNet trades publicly" (emphasis added).

The May 25 "Offering Circular" constituted the official and lengthy legal documentation for Fund III. The formal terms of the Offering Circular appear to give the Fund Managers authority to invest Fund III money in other companies. The accompanying "Letter of Instruction" and "Notice of Loan Conversion," however, give the clear impression that the preferred units will be used only for BuildNet's IPO. For example, they explain that "[b]y converting to [preferred units] the undersigned also understands that he, she or it will not be participating in the other investments of the Venture Capital Fund" and that "[t]he preferred units exist strictly to facilitate the upcoming BuildNet IPO." Most Fund III investors converted to preferred units.

6

In an "Update Memorandum" dated July 18, the Fund Managers sought to calm investors concerned with the delay in BuildNet's IPO. Despite the fact that investors' money had been invested in other companies and was illiquid by this time, the Fund Managers reiterated that preferred investors in Fund III would have their money returned within 60 days if BuildNet withdrew its SEC registration.

An August 2 letter (signed only by Van Etten) continued to profess a belief that the BuildNet IPO would go through. It also encouraged preferred unit holders to convert their investments to common units, so that "[y]our money will be working for you today earning profit opportunities, as opposed to sitting in the Preferred fund until BuildNet goes public." In reality, this money was not "sitting" in any fund, but had already been invested in other companies.

On October 24, BuildNet withdrew its SEC registration. On November 20, the Fund Managers sent a third "Update Memorandum" informing preferred investors that, pursuant to the terms of the promissory note, they had the option to request that their investments be returned. However, it encouraged investors to convert their preferred units to common units. Most investors asked for a return of their investment. In response, investors were sent individual letters informing them that "it does not appear that the invested funds can be paid" back as promised.

7

Of the approximately $15 million loaned by investors to Fund III, only about $422,000 was ever returned to them. The bulk of the money ($13 million) was invested in other portfolio companies, with the rest going to Mayflower Capital and administrative expenses.

C.

On the basis of these facts, the Government charged Diane Pace, Brent Wood, and Stanley Van Etten with six counts of mail fraud in violation of 18 U.S.C. §§ 1341 & 2 (2006), one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, one count of wire fraud in violation of 18 U.S.C. §§ 1343 & 2, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).[2] Van Etten eventually pleaded guilty, as did three of the five Fund Managers: Eilers, Pollack, and Brothers. The remaining two Fund Managers, Pace and Wood, pleaded not guilty and preceded to a joint trial; Eilers, Pollack, and Brothers agreed to cooperate and testified for the prosecution at that trial.

---

[2] The six counts of substantive mail fraud correspond to the six documents described above. The conspiracy count alleges an unlawful agreement among Van Etten and the Fund Managers to send these misleading letters to investors. The money laundering count alleges that the defendants used the fraudulently-obtained funds to prop up Mayflower's non-BuildNet investments, and thus obscure the misuse of investor money.

The Government's theory at trial was that Van Etten and the Fund Managers (including Pace and Wood) deliberately misrepresented to investors that their money would be held in a separate account and used for the BuildNet IPO only. In fact, management used the money as a bridge loan to invest in other portfolio companies and thus prop up Funds I and II, which had made unsuccessful investments. The Government acknowledges that the Fund Managers may have believed that the investor money would ultimately be repaid, but correctly maintains that this does not excuse the fraudulent misrepresentations. See United States v. Curry, 461 F.3d 452, 458 (4th Cir. 2006).

At trial, Pace did not dispute that the documents described above were sent to investors, and that management in fact used the Fund III money to invest in companies other than BuildNet. She did dispute her involvement in the scheme and her intent. Pace maintained that her role in Fund III was solely administrative, that she was not aware of many documents until after they had been sent to investors, and that she did not know what other members of management had told investors. Pace testified that she believed that the investors had authorized her and the other Fund Managers to invest their money in other portfolio companies.

After a nine-day trial, a jury convicted Pace (and Wood) of all counts but the charge of wire fraud. Following the verdict,

9

the defendants renewed their motions for a judgment of acquittal, which they had originally made at the conclusion of the Government's case-in-chief.  The district court granted these motions and conditionally granted a new trial.  The district court justified both the judgment of acquittal and the conditional new trial on the ground that the evidence was insufficient for a reasonable juror to conclude that the defendants had a specific intent to defraud investors.  The Government timely noted this appeal.

## II.

The district court rested its decision to grant a new trial solely on its assessment that "a rational trier of fact could not review the evidence and conclude that either Wood or Pace acted with a specific intent to defraud investors or to launder money."  On appeal, Pace adopts the district court's view that the Government failed to present sufficient evidence that she acted with an intent to defraud.  The Government points to the testimony of Pace's co-conspirators and other circumstantial evidence from which, it asserts, the jury could infer such an intent.

### A.

Federal Rule of Criminal Procedure 29 provides that a district court "must enter a judgment of acquittal [when] the

evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). We review a district court's grant of a judgment of acquittal de novo, assessing whether, taking the evidence in the light most favorable to the Government, a rational trier of fact could have found all of the elements of the charged offense beyond a reasonable doubt. See United States v. Singh, 518 F.3d 236, 246 (4th Cir. 2008).

With respect to the counts of substantive mail fraud, the Government was required to prove (1) the existence of a scheme to defraud, and (2) the use of mails to execute the scheme. United States v. Vinyard, 266 F.3d 320, 326 (4th Cir. 2001). To prove the first element, the Government must show that "the defendants acted with the specific intent to defraud, which 'may be inferred from the totality of the circumstances and need not be proven by direct evidence.'" United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001) (quoting United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993)).

With respect to the count of conspiracy to commit mail fraud, the Government was required to prove (1) an agreement to commit mail fraud, (2) willing participation by the defendant, and (3) an overt act in furtherance of the agreement. United States v. Edwards, 188 F.3d 230, 234 (4th Cir. 1999). Conspiracy to commit mail fraud also requires that the Government show that the defendant acted with a specific intent

11

to defraud.  Ham, 998 F.2d at 1254.  This specific intent may be proven wholly by circumstantial evidence.  United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996) (en banc).

With respect to the count of conspiracy to commit money laundering, the Government was required to prove (1) an agreement to commit money laundering existed, (2) the defendant knew that the money laundering proceeds had been derived from illegal activity, and (3) the defendant knowingly and voluntarily joined the conspiracy.  Singh, 518 F.3d at 248.

Because each of these crimes requires, at most,[3] that the Government prove that Pace acted with a specific intent to defraud -- and the parties only dispute the evidence of this element -- we must reinstate the jury verdict if the Government presented sufficient evidence from which a reasonable juror could find the required intent beyond a reasonable doubt.

B.

Pace's alleged co-conspirators, Pollack and Brothers, provided the Government's strongest evidence of Pace's fraudulent intent.  On July 23, Pollack sent an email to Wood, with a copy to Pace.  At the time, Pollack was looking to secure

---

[3] On appeal, the Government argues that conspiracy to launder money in violation of 18 U.S.C. § 1956(h) does not require a specific intent, but only knowledge of the conspiracy. See Brief of Appellant at 53.  Because we conclude the evidence sufficed to show a specific intent, we do not reach this issue.

12

a short-term loan for Mayflower from two of its investors, but explained that he did not wish to disclose confidential financial information to them because:

> If these two investors, or any of several investors for that matter, find out that their "IPO money" has been spent as it has . . . in my opinion we will not only not get this bridge loan, additional larger problems may be brought on by these investors.

Both Wood and Pace testified that the July 23 email provided their first knowledge that investors had been told that Fund III preferred units were to be limited to investment in BuildNet. Wood's response email indeed professed ignorance: "I am not sure what was told to investors when they originally loaned money to Fund III. I very carefully prepared the notes so that the money could be used for any purpose we deemed appropriate."

Pollack, however, contradicted this claim, testifying that he was "surprised" at Wood's email response "because I'm quite sure that <u>everyone of us [i.e., the five Fund Managers] knew what investors were told</u>" (emphasis added). Brothers corroborated Pollack's testimony, stating that "we told every single investor, and everybody knew, that [Fund III] was for the sole purpose of investing into BuildNet IPO." He further explained that "[w]e talked as a group and said this is what we're doing . . . we said we're going to borrow this money for the IPO shares."

13

In addition to this co-conspirator testimony, the Government presented other evidence of Pace's intent. One Mayflower investor, Stephen Lack, testified that his impression that investments in the BuildNet IPO would be separated from other Fund III investments came from a personal meeting with Pace and Van Etten. Another investor testified that Brothers told him in March 2001 that "[the Fund Managers] had known in the summer of 2000 that the money was gone, but were afraid to disclose it to investors." Although Pace denies knowing about some of the documents sent to investors detailed above, many of these documents appear to be sent from her (as a Fund Manager) or contain her signature; her knowledge of these documents was a fact question properly left to the jury. Moreover, financial records introduced by the Government indicate that Pace bore personal responsibility for disbursing $5,452,281 of Fund III money to non-BuildNet companies.

The Government thus presented evidence from which a jury could conclude that Pace (1) knew what the investors were being told, and yet (2) disbursed their money to companies other than BuildNet. To be sure, Pace contradicted this evidence in her testimony, which professed ignorance of the misrepresentations made to investors. But her co-conspirators explicitly stated that "everyone of us knew" what was going on. The jury was thus free to disbelieve Pace and, moreover, view her false

14

exculpatory testimony as probative of her intent. In short, viewing the evidence in the light most favorable to the Government, as we must, the Government presented evidence more than sufficient for a rational juror to conclude that Pace had the specific intent to defraud and launder money. The district court therefore erred in granting Pace a judgment of acquittal.

III.

The Government next asserts that the district court erred in conditionally granting a new trial. We review a district court's grant of a new trial for an abuse of discretion. United States v. Wilson, 118 F.3d 228, 237 (4th Cir. 1997). The district court may order a new trial if the evidence weighs so heavily against the verdict that to deny a new trial would be contrary to the "interest of justice." Fed. R. Crim. P. 33; United States v. Campbell, 977 F.2d 854, 860 (4th Cir. 1992). Unlike a judgment of acquittal, a district court may consider the credibility of witnesses and need not view the evidence in the light most favorable to the government in determining whether to grant a new trial. Campbell, 977 F.2d at 860.

Although the decision to grant a new trial lies within the discretion of the district court, respect for the role of the jury demands that a court exercise this discretion "sparingly," United States v. Smith, 451 F.3d 209, 217 (4th Cir. 2006), i.e.,

15

only when "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985). Here, the district court offered only a single sentence to explain its decision to grant a new trial, asserting, without support, its conclusion that "the evidence in this case weighs heavily against the verdict." We do not believe a district court should overturn a jury verdict so lightly. Because the court did not otherwise explain its decision,[4] we must presume that it granted a new trial for the same reasons it granted a judgment of acquittal: that the evidence was insufficient to support the verdict. Because we have concluded that the evidence was sufficient, we must find the grant of a new trial an abuse of discretion.

IV.

For the foregoing reasons, we reverse the district court's judgment of acquittal and its conditional grant of a new trial. We remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED

---

[4] For example, the district court did not offer any reason why it (unlike the jury) found Pace credible, or Pollack and Brothers incredible.

16